## COMMONWEALTH *vs.* HELDER BARBOSA.

Suffolk. February 12, 2010. - September 7, 2010.

Present: MARSHALL, C.J. IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Deoxyribonucleic Acid. Constitutional Law,* Confrontation of witnesses. *Evidence,* Hearsay, Expert opinion, Cross-examination, Prior misconduct, Motive, Prior consistent statement, Impeachment of credibility, Admissions and confessions, Photograph, Relevancy and materiality. *Practice, Criminal,* Instructions to jury, Admissions and confessions, Capital case. *Homicide.*

At a criminal trial, the admission in evidence of expert opinion testimony by a senior criminalist at a police crime laboratory, regarding the significance of the results of deoxyribonucleic acid (DNA) testing conducted by another analyst, did not violate the defendant's right of confrontation, where the defendant had a fair opportunity to confront the criminalist as to the reasonable basis for that opinion [782-786]; further, the erroneous admission in evidence of the criminalist's testimony as to the opinion and factual findings of the analyst who conducted the testing, as well as the erroneous admission in evidence of a table summarizing those factual findings, in violation of the defendant's confrontation rights, did not create a substantial likelihood of a miscarriage of justice, where such evidence, although harmful to the defendant's claim of misidentification, was not particularly meaningful without the criminalist's expert opinion (i.e., interpretation and analysis of the DNA evidence), as to which defense counsel ably cross-examined, and where there was other overwhelming evidence against the defendant [786-793].

At the trial of indictments charging, inter alia, murder and armed assault with intent to murder, the judge did not abuse her discretion in admitting in evidence the assault victim's testimony that he and the murder victim had witnessed the defendant commit another murder roughly two weeks before the crimes for which he was being tried, where the record reflected that the judge appropriately balanced the probative weight of the evidence with the risk of unfair prejudice and prudently determined that the evidence was admissible for a limited purpose only, i.e., to demonstrate the defendant's motive to shoot the victims [793-794]; further, the judge's strong instruction regarding the limited purpose for which the jury could use the evidence, taken verbatim from defense counsel's request, correctly ensured that the jury would first decide whether they believed the evidence before they inferred motive based on it [794-797].

At the trial of indictments charging, inter alia, murder and armed assault with intent to murder, the judge did not err in admitting a prior consistent statement of the assault victim, and the judge's failure to give, sua sponte, a jury instruction regarding their evaluation of the statement (to determine

whether the assault victim's testimony at trial, regarding a prior bad act by the defendant, was recently contrived) did not result in a substantial likelihood of a miscarriage of justice. [797-798]

At a criminal trial, the erroneous admission in evidence of a police interview containing the defendant's unequivocal, post-Miranda denials of guilt did not create a substantial likelihood of a miscarriage of justice, where the police officer's statements were cumulative of other evidence and were stated only briefly and in general terms, and where the defendant's denials actually supported and were consistent with his defense that he was misidentified as a suspect. [798-800]

In the circumstances of a criminal trial, no prejudice arose from the judge's incomplete jury instructions regarding the failure of the police to tape record the postarrest interrogation of the defendant. [800-802]

At a murder trial, the judge acted well within her discretion in admitting a redacted autopsy photograph of a portion of the victim's skull, where the photograph was relevant to the issue of extreme atrocity or cruelty. [802-803]

This court, after reviewing the record of a murder trial, discerned no error, considered alone or collectively, that provided a just basis to set aside or reduce the verdict of murder in the first degree. [803-804]

INDICTMENTS found and returned in the Superior Court Department on November 15, 2004.

The cases were tried before *Margaret R. Hinkle,* J.

*Elizabeth Doherty* for the defendant.

*Elisabeth Kosterlitz,* Assistant District Attorney, for the Commonwealth.

GANTS, J. The defendant was charged with shooting Geraldo Carbuccia and Edward Serret on October 6, 2004, injuring Carbuccia and killing Serret. On February 2, 2007, a jury in the Superior Court convicted the defendant of murder in the first degree of Serret on the theories of deliberate premeditation and extreme cruelty or atrocity, and of armed assault of Carbuccia with intent to murder.[1]

Represented by new counsel, the defendant appeals from his

---

[1]The defendant was also convicted of the assault and battery of Carbuccia by means of a dangerous weapon, and of the unlawful possession of a firearm. The defendant was sentenced to life without the possibility of parole on the murder conviction, and to from fourteen years to fourteen years and one day on the armed assault with intent to murder conviction, to be served on and after his life sentence. He was also sentenced to from ten years to ten years and one day on his conviction of assault and battery by means of a dangerous weapon, and to from two and one-half years to two and one-half years and one day on the unlawful firearm possession conviction, both to be served concurrently with the sentence for the armed assault with intent to murder conviction.

convictions. On appeal, the defendant claims that his constitutional right of confrontation was violated when a senior criminalist at the Boston police department's crime laboratory testified to the results of deoxyribonucleic acid (DNA) testing that she did not conduct. The defendant also argues that the trial judge erred in admitting evidence of (1) an earlier, uncharged murder, allegedly committed by the defendant; (2) an out-of-court statement by Carbuccia and Serret that they had witnessed the earlier, uncharged murder; (3) the defendant's unequivocal, post-Miranda denials of guilt; and (4) an autopsy photograph depicting Serret's injuries. Finally, the defendant claims that the judge did not adequately instruct the jury with respect to (1) the limited permissible use of the uncharged murder evidence, and (2) the failure of the police to tape record its postarrest interrogation of him. While we conclude that there were some errors in the conduct of the trial, they do not justify reversal. After a review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his murder conviction to a lesser degree of guilt or to order a new trial. Accordingly, we affirm the defendant's convictions.

1. *Background.* The evidence, viewed in the light most favorable to the Commonwealth, showed that, at approximately 7 P.M. on October 6, 2004, Serret and Carbuccia were walking on a street in the Roxbury section of Boston when they encountered the defendant on his bicycle. Carbuccia had seen the defendant only twice before, but he knew that Serret and the defendant were better acquainted. The three walked together to Robey Street, where the defendant left them in an alleyway, and they waited for him to return. After five to ten minutes, the defendant returned, and immediately pulled out a gun. From ten to fifteen feet away, the defendant shot Carbuccia in the shoulder, and he fell to the ground. While on the ground, Carbuccia heard three or four more shots, and then heard Serret say to the defendant, "Dammit, you're going to kill me."

An eyewitness, Luis Sanches, heard three or four shots fired on Robey Street and then saw the defendant and Serret running from Robey Street onto Marshfield Street. They were punching each other as they ran down the sidewalk across the street from Sanches's house. Sanches heard one more gunshot, and Serret fell to the ground. As Serret lay on the ground, the defendant

continued to punch him before running away and turning the corner at Norfolk Avenue.

After the police were called, a paramedic in a city of Boston ambulance, while en route to Marshfield Street, noticed Carbuccia lying near the corner of East Cottage and Robey Streets and stopped his vehicle. Carbuccia was not alert or conscious and appeared to be suffering profound shock from a gunshot to his upper extremity, with significant blood loss. The paramedic quickly put Carbuccia in the back of the vehicle and continued to Marshfield Street, where he saw Serret, who had no signs of life and obvious trauma to his interior chest, neck, and skull region. Serret was moved into another ambulance and pronounced dead, while Carbuccia survived.

Between 8 and 8:30 P.M. that evening, Officers William Hubbard and Charles MacKinnon were in uniform and patrolling the Uphams Corner area in a marked Boston police cruiser when they received a radio call to respond to the scene at Marshfield Street. Approximately one minute later, when they were on Burrell Street, about one or two blocks from Marshfield Street, they observed the defendant walking toward them, moving at a brisk pace in the direction of Clifton Street. He appeared to be short of breath, and his face was glistening with sweat. Officer Hubbard rolled down his window and asked the defendant whether he had heard gunshots. Pointing to the intersection of Burrell and Bachelder Streets, toward which the officers were headed, and making excited gestures with his hands, the defendant said, "Over there, I heard shots, they are crazy, I had to run." As he said this, he stepped away from the cruiser.

Officer Hubbard opened his door, and the defendant immediately began to run. Officer Hubbard followed him on foot, yelling, "Boston police, stop," but the defendant did not comply. After the defendant stumbled and lost a boot, Officer Hubbard caught up to the defendant and tackled him in the street. While still on the defendant's back, Officer Hubbard ordered him to show his hands. Instead, the defendant crawled toward the sidewalk, about five feet away. As they struggled on the ground, Officer Hubbard heard a loud splash and saw the defendant's hand emerge from a catch basin. The defendant then showed his hands to Officer Hubbard and ceased to struggle. The defendant

was handcuffed, placed in the back of another cruiser that had arrived, and the boot that he had lost was returned to him.

In order to retrieve the item that the defendant dropped in the catch basin, the police contacted Daniel O'Brien, a supervisor of operations for the Boston Water and Sewer Commission. O'Brien attempted to retrieve the item by lowering a powerful magnet attached to a nylon rope on his truck down into the basin, "almost like fishing." He could feel the magnet attracted to something, but could not pull up the object. One of O'Brien's employees, Kevin McNeil, then brought a "clam truck," which was used to scoop debris from the basin and dump it onto the sidewalk. A nine millimeter Bryco semiautomatic pistol was recovered in the first scoop; O'Brien testified that "usually, if you find something the first scoop it hasn't been there that long." No other items of interest were recovered from the catch basin.

At approximately 9:25 P.M. that night, Detective Dennis Harris, with Sergeant Detective Thomas O'Leary also present, interviewed the defendant at Boston police headquarters. Detective Harris read the defendant his Miranda warnings, and the defendant initialed and signed a Miranda warnings sheet. The interview was not tape recorded. The defendant was sober, alert, and calm. He stated that he had just left a bar on Shirley Street and was at the intersection of Shirley and George Streets when he heard gunshots. When the police pulled up next to him in their cruiser and he saw the officers leaving the cruiser, he decided to run because he believed there was a warrant for his arrest based on a motor vehicle infraction.[2] The defendant then changed his previous account, saying that he was going to, not coming from, the bar on Shirley Street. He initially said his route included Marshfield Street, but then denied having been on Marshfield Street that evening. When asked directly, the defendant denied any involvement in the shootings and denied throwing anything into the catch basin.

Detective Harris left the interview room at 10:05 P.M., called an officer still at the scene, and learned that a firearm had been recovered from the catch basin. Detective Harris returned to the interview room and informed the defendant that a firearm was

---

[2] A record check revealed no warrants for the defendant's arrest.

found and that he was being charged with its unlawful possession. When he heard this, the defendant dropped his head to his knees. The interview ended shortly thereafter.

When Detective John Callahan interviewed Carbuccia on October 11 at the hospital, Carbuccia stated that he did not know who had shot him because he "didn't get a good look" at the shooter.[3] On October 16, when Carbuccia was out of the hospital and at his mother's house, Detective Callahan again spoke with Carbuccia, but Carbuccia provided no new information. Two days later, however, after Carbuccia had contacted Detective Callahan's partner, Sergeant Detective Richard Daley, Carbuccia gave a tape-recorded statement in which he said that the defendant shot him and selected a photograph of the defendant from an array of eight photographs.[4]

It was not until Carbuccia met with the district attorney on December 21, 2006, in preparation for trial that Carbuccia first said that he had witnessed the defendant shoot another man on September 21, 2004, approximately two weeks before the defendant shot him and Serret.[5] At trial, Carbuccia testified that on September 21, 2004, he was with Serret when he saw the defendant, with two other persons, walk past them on a sidewalk on Dudley Street in Roxbury. Serret, who knew the defendant, asked him, "What up?," but the defendant replied that he was unable to talk. Serret and Carbuccia then watched as the defendant shot a Hispanic man in the head after the defendant and his two companions had persuaded the man to exit his parked vehicle. The man fell onto the hood of the vehicle and died.

That night, Serret and Carbuccia told Serret's mother that they "saw something." After Serret died, three pieces of paper

---

[3]Detective Callahan had briefly interviewed Carbuccia in the hospital on October 8, 2004, but the interview was cut short because Carbuccia was in pain and medicated.

[4]This was the first time Carbuccia had viewed a photograph array. He was not told that the defendant had already been arrested.

[5]After this meeting, the district attorney provided Carbuccia with $340 for food over the course of five weeks, and paid for him to stay in a hotel for several weeks. The district attorney's office had earlier provided him with financial assistance in October, 2004, after he left the hospital and moved to a new place for "[s]afety issues." Based on the cross-examination of Carbuccia, we infer that this information had been furnished in discovery to defense counsel.

were recovered from his wallet. On one was written the letter "C," which was the defendant's nickname, and a telephone number that was assigned to the cellular telephone that was recovered from the defendant after his arrest. The other two pieces of paper also had the letter "C" written on it, along with a different telephone number, which was assigned to a prepaid cellular telephone with no name assigned to the account. Telephone records for this prepaid telephone revealed thirty-seven telephone calls to and from that number and Serret's mother's telephone number between September 23 and September 27, 2004. Serret was living at his mother's house prior to his death.

During the interview of the defendant on the night of the shooting, Detective Harris noticed that the toe area of the defendant's left boot had a reddish-brown stain on it. The defendant claimed he did not know what it was. Detective Harris took the defendant's boots from him. After the interview, Detective Harris also took the defendant's pants.

Forensic testing of reddish-brown stains on the defendant's left boot and lower left pant leg tested positive for the presence of human blood. Samples were taken of each stain for DNA testing. Julie Lynch, a senior criminalist in the DNA unit of the Boston police department, testified that Serret was "included as being the possible source of the DNA extracted from" both bloodstains, while the defendant was excluded as a possible source of the DNA from both. She later testified to the significance of Serret's inclusion as a "possible source of the DNA" found on the defendant's boot and pant leg — that DNA profile could be expected to be found in approximately one in thirty-five quadrillion Caucasians, one in fourteen quadrillion African-Americans, and one in 7.1 quadrillion South Eastern Hispanics.[6]

Dr. Richard Evans, a medical examiner and forensic pathologist with the medical examiner's office in Boston, testified to the autopsy he performed on October 7, 2004. He observed two types of injuries: gunshot wounds and blunt trauma. There were six gunshot wounds, all with entrances on the back of the body. Dr. Evans also noted twelve lacerations on the left side of the

---

[6]The record reflects that the defendant was described by Officer William Hubbard as a "black, non-Hispanic male."

head and four lacerations on the back side of the head. These lacerations involved the tearing, not cutting, of tissues because they were made by blunt, not sharp, force. Underneath the twelve lacerations on the side of the head was a two by three inch depressed skull fracture. Several autopsy photographs were introduced in evidence, and the defendant objected only to the partially redacted image of the fracture in Serret's skull. Dr. Evans testified that the lacerations and fracture were not associated with internal hemorrhaging, which meant that these injuries were most likely sustained after Serret's heart had stopped beating. In his medical opinion, the cause of death was the gunshot wounds, not the blunt trauma to the head.

Seven spent nine millimeter shell casings and two nine millimeter bullet fragments were recovered from Marshfield and Robey Streets. The Commonwealth's ballistics expert, Detective Tyrone Camper, testified to his opinion that the seven cartridge casings found at the scene of the shootings were fired from the nine millimeter Bryco semiautomatic pistol recovered from the catch basin, and that this firearm was in working condition.

*Discussion. DNA evidence.* The defendant argues that he was denied his right of confrontation under the Sixth Amendment to the United States Constitution when Lynch testified about the results of the DNA testing performed by another analyst, Cheryl Delatore, who was no longer employed by the Boston police department at the time of trial.[7] Because the defendant challenges the admissibility of portions of Lynch's testimony, we describe her testimony in some detail.

After testifying to her education and experience in forensic DNA testing, Lynch explained that a DNA profile is a set of DNA characteristics that is "not necessarily unique but . . . is . . . rarely found in the population." She testified that the crime laboratory receives two types of biological evidence: (1) evidence from an unknown source, such as evidence taken from a crime

---

[7]The defendant does not claim a violation of his confrontation rights under art. 12 of the Massachusetts Declaration of Rights. The absence of such a claim, however, is inconsequential because where the question, as here, involves the relationship between the rules of evidence and the right of confrontation, "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment [to the United States Constitution] . . . ." *Commonwealth* v. *Nardi*, 452 Mass. 379, 388 n.10 (2008), quoting *Commonwealth* v. *De-Oliveira*, 447 Mass. 56, 57 n.1 (2006).

scene, and (2) samples from a known source, such as an individual allegedly involved in the case. The laboratory generates DNA profiles from both types of evidence and compares them. If the DNA profile from an unknown source and a known source are the same, Lynch concludes that the individual whose DNA comprised the known source is included as a possible source of the DNA from the unknown source.[8] If the DNA profiles of an unknown source and a known source do not match, then the individual whose DNA comprised the known source cannot be the source of the DNA from the unknown source and is excluded as a possible source.

Lynch testified that there are four steps involved in the DNA testing conducted by the Boston police department crime laboratory. The first is "extraction," in which the DNA is extracted from the cells. The second is "quantitation," in which the DNA analyst determines the quantity of DNA that was extracted. The third is "copying," in which the crime laboratory uses a polymerase chain reaction-based test to make millions, sometimes billions, of copies of the DNA. This allows the laboratory to be able to test samples that otherwise might be quantitatively too small. The fourth is "typing," in which a genetic analyzer, known as the AmpFlSTR identifier PCR amplification kit, determines the characteristics of the alleles at sixteen different positions on various DNA chromosomes, which collectively constitute the DNA profile.

Here, four samples were tested: (1) the reddish-brown stain from the defendant's left boot, (2) the reddish-brown stain from the defendant's lower left pant leg, (3) a bloodstain from Serret, and (4) an oral swab from the defendant. Lynch testified that Serret was included as a possible source of the DNA found on the defendant's boot and pant leg, while the defendant was excluded as a possible source of that DNA. A table prepared by Delatore was introduced in evidence showing the characteristics of the sixteen different positions on each of the four DNA profiles. Lynch also orally conveyed some of the information within the table to the jury during her direct examination. She

---

[8]We note that inclusion as a possible source here is a conservative characterization because the likelihood that another person matches that profile is infinitesimal.

explained that, "[f]or a single-source profile like this they have to match exactly for that individual to be included as a possible source." Because Serret's DNA profile was precisely the same in all sixteen locations as the DNA profile of the bloodstains on the defendant's boot and pant leg, Serret was included as a possible source.

During most of her testimony, particularly on direct examination, Lynch gave the impression that she personally participated in each of the four steps to test these four samples, using the pronoun "we" in describing the conduct of the testing. The defendant did not object to any of Lynch's testimony but, on cross-examination, elicited that Lynch did not perform the DNA testing in this case. Rather, she had supervised and trained the analyst who conducted the testing, Delatore. Lynch testified that she reviewed Delatore's work by looking at the worksheets and reports that Delatore generated during the testing process, and signed Delatore's final report regarding the testing that had been performed and the results of the testing, noting that accreditation standards require a full technical review on all DNA reports that are issued.

Defense counsel also elicited from Lynch that the DNA in this case was transferred from one test tube to another at least five times, and that, if Delatore had mislabeled a test tube containing the defendant's known DNA as Serret's known DNA, the characteristics of the sixteen different positions on each of the four DNA profiles would remain unchanged, but the defendant, not Serret, would be included as a possible source of the DNA found on the defendant's boot and pant leg.[9] Lynch acknowledged that, because she was not "standing over [Delatore's] shoulders," she had "no idea" whether one of the test tubes was improperly labeled or confused with another. The only way to be certain that a mistake did not occur, she testified, would be to retest the samples, which was not done in this case.[10,11]

The defendant argues, and the Commonwealth concedes, that

[9]When interviewed after his arrest, the defendant mentioned that, while running from Officer William Hubbard, he fell and hurt his knee. Detective Harris observed the defendant rubbing his knee throughout the interview.

[10]Julie Lynch testified that "stain" remained from the samples for potential additional testing.

[11]No evidence was offered that any mislabeling had actually occurred.

Delatore's table showing the results of the DNA testing was testimonial hearsay admitted in violation of the confrontation clause, as was Lynch's testimony conveying the information in the table to the jury. See *Crawford* v. *Washington*, 541 U.S. 36 (2004). The defendant also argues that Lynch's expert opinion regarding the significance of the DNA test results violated the confrontation clause because her opinion was based on Delatore's work product, which itself was testimonial, and essentially repeated her findings. To address this latter argument, we examine the intersection between our common-law rules of evidence concerning expert testimony and the constitutional right of confrontation to illustrate that our evidentiary rules and the Sixth Amendment are in harmony.

Under our common-law rules of evidence, the Commonwealth must establish five foundational requirements before expert testimony will be admitted in a criminal case: (1) that the expert testimony will assist the trier of fact, see *Commonwealth* v. *Little*, 453 Mass. 766, 768 (2009); (2) that the witness is qualified as an expert in the relevant area of inquiry, see *Commonwealth* v. *Frangipane*, 433 Mass. 527, 533 (2001); (3) that the expert's opinion is based on facts or data of a type reasonably relied on by experts to form opinions in the relevant field, see *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986); (4) that the process or theory underlying the opinion is reliable, see *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994); and (5) that the process or theory is applied to the particular facts of the case in a reliable manner, see *Commonwealth* v. *Patterson*, 445 Mass. 626, 648 (2005). See generally Mass. G. Evid. § 702, at 218-224 (2010). If a defendant contends that any of these foundational requirements is missing, the defendant may move in limine to prohibit the admission of the expert testimony and request a hearing. See *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan, supra.* Where the motion in limine challenges the reliability of the expert's opinion, the judge must perform the role of "gatekeeper" to ensure that the expert testimony meets a minimum standard of reliability. See *id.* If, as here, there is no motion in limine and no invocation of the judge's gatekeeper role, the expert's opinion may be admitted in evidence.

Where a Commonwealth expert testifies to her own opinion,

the opinion is not hearsay, because the declarant of the opinion is testifying at trial. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 693 (2001) ("Hearsay is an out-of-court statement offered to prove the truth of the matter asserted"). Similarly, because the defendant may confront the declarant of the opinion through cross-examination, the defendant is not deprived of his right of confrontation. See *United States* v. *Johnson*, 587 F.3d 625, 635 (4th Cir. 2009), cert. denied sub nom. *Martin* v. *United States*, 130 S. Ct. 2128 (2010) (expert opinion "an original product that can be tested through cross-examination"). However, if a Commonwealth expert on direct examination were to testify to the conclusion or opinion of a second, nontestifying expert, that conclusion or opinion would be inadmissible hearsay. See *Commonwealth* v. *Evans*, 438 Mass. 142, 152 (2002), cert. denied, 538 U.S. 966 (2003) (because expert testimony "went to the fact of the test results obtained by someone else, it was hearsay"); *Commonwealth* v. *McNickles*, 434 Mass. 839, 857 (2001) ("expert witness may not, on direct examination, present the specifics of hearsay information on which she has relied in reaching her opinion"). If the conclusion or opinion of the nontestifying expert is testimonial, because a reasonable expert would anticipate that her findings would be available for use at trial, its admission would also violate the defendant's right of confrontation, because the opinion of the second expert would not be subject to cross-examination. See *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2532 (2009) (*Melendez-Diaz*). See also *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3 (2005), cert. denied, 548 U.S. 926 (2006) (testimonial nature determined by "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime").

Until our opinion in 1986 in *Department of Youth Servs.* v. *A Juvenile*, *supra*, there was little risk that an expert would testify to inadmissible hearsay evidence in explaining the basis for her opinion, because the expert opinion had to be "based on either the expert's direct personal knowledge, on evidence already in the record or which the parties represent will be presented during the course of the trial, or on a combination of these sources." *LaClair* v. *Silberline Mfg. Co.*, 379 Mass. 21, 32 (1979). When

we expanded the permissible basis of an expert opinion to include "facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion," *Department of Youth Servs.* v. *A Juvenile, supra* at 531, we prohibited the expert during her direct examination from informing the jury about the facts or data she considered that were not in evidence but that would be admissible with the right witness or proper foundation. See *Commonwealth* v. *Markvart,* 437 Mass. 331, 337-338 (2002). "The thrust of [our] rule is to leave inquiry regarding the basis of expert testimony to cross-examination . . . ." *Department of Youth Servs.* v. *A Juvenile, supra* at 532, quoting Advisory Committee's Note on Proposed Mass. R. Evid. 705.

This balance between the jury's need to learn the factual basis of an expert's opinion and the danger that the Commonwealth would use an expert's opinion to inform the jury of facts not in evidence was fashioned before the United States Supreme Court's opinions in *Crawford* v. *Washington,* 541 U.S. 36 (2004), and *Davis* v. *Washington,* 547 U.S. 813 (2006), regarding the Sixth Amendment right of confrontation, but it is consistent with the right of confrontation articulated in those opinions, even where the expert bases his opinion on testimonial evidence that is admissible but not admitted. See *Commonwealth* v. *Nardi,* 452 Mass. 379, 387-396 (2008). See also *Commonwealth* v. *Hensley,* 454 Mass. 721, 732-733 n.7 (2009) (in forensic science context, expert may rely on work of nontestifying analysts). Where the Commonwealth calls an expert witness, direct examination is limited to the expert's opinion and matters of which the expert has personal knowledge, such as her training and experience, and the protocols generally accepted in her field of expertise. See *Commonwealth* v. *Nardi, supra* at 390-391. Only the defendant can open the door on cross-examination to testimony regarding the basis for the expert's opinion, which may invite the expert witness to testify to facts or data that may be admissible in evidence but have not yet been admitted in evidence, and that may be testimonial in nature. See *id.* A defendant, however, cannot reasonably claim that his right to confront the witnesses against him is violated by the admission of evidence that he elicits on cross-examination. Indeed, a defendant could reasonably claim a violation of that right only

if he were denied the opportunity to elicit this information on cross-examination. See *Department of Youth Servs.* v. *A Juvenile, supra* (judge not permitted to exclude questions on cross-examination "designed to elicit the underpinnings of the expert's opinion").

Applying these principles here, the defendant's right of confrontation was not violated by the admission of Lynch's opinion, because he had a fair opportunity to confront Lynch as to the reasonable basis for that opinion. See *Commonwealth* v. *Nardi, supra* at 390 ("fact that [testifying medical examiner's] expert opinion on the cause of [victim's] death was based, in large part, on findings made during the course of an autopsy that he did not perform does not infringe on [defendant's] right to confrontation concerning this issue"). The defendant's right of confrontation, however, was violated by Lynch's testimony as to what they had found, which informed the jury that Delatore also shared that opinion, when Delatore's opinion was testimonial hearsay and Delatore was not subject to cross-examination. See *id.* at 392. The defendant's right of confrontation was also violated, as the Commonwealth concedes, by the admission in evidence of Lynch's testimony reciting Delatore's findings regarding the DNA testing, as well as the admission of the table prepared by Delatore showing the DNA characteristics of the four tested samples. See *id.* at 392-393.

The defendant, however, contends that the rules we have described, which approve the admission in evidence on direct examination of Lynch's opinion but not of Delatore's opinion or her findings or table, do not apply in this case for two reasons. First, he contends that the Supreme Court's decision in *Melendez-Diaz, supra*, should be understood to mean that the Commonwealth may not offer *any* opinion that is based on the results of tests conducted by a forensic analyst or examiner unless the analyst or examiner is available to testify at trial (or unless the analyst or examiner is shown to be unavailable at trial and the defendant had a prior opportunity to cross-examine her). We do not give so expansive an interpretation to the *Melendez-Diaz* decision.

In *Melendez-Diaz*, the Supreme Court addressed whether a defendant's Sixth Amendment right of confrontation was violated by the admission in evidence of certificates of analysis signed

by analysts at the State Laboratory Institute that declared that the substance examined contained cocaine. See *Melendez-Diaz, supra* at 2531. The Supreme Court held that "[t]he Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits," and concluded that the admission of the certificates against the defendant was error. *Id.* at 2542. In the context of expert testimony, *Melendez-Diaz* stands simply for the proposition that, under the Sixth Amendment right of confrontation, the Commonwealth may not offer an expert opinion in evidence unless the defendant has an opportunity to cross-examine the expert. *Id.* at 2535 (expert witnesses not exempt from coverage of confrontation clause). It did not address, and therefore did not decide, the quite different question whether under the Sixth Amendment the Commonwealth may proffer an expert on the chemical composition of cocaine to testify to her opinion as to whether the substance contained cocaine where she examined the test results but did not conduct the chemical tests herself. See *United States* v. *Boyd*, 686 F. Supp. 2d 382, 383 (S.D.N.Y. 2010) (characterizing as "adverted to but left open" question whether, where "expert witness who takes the stand made the final determination as to the DNA match, and in so doing, relied on the results of tests performed by other members of the lab, does the failure to call the analysts who conducted the preliminary tests infringe the defendant's right under the Confrontation Clause?"). Because *Melendez-Diaz* did not purport to alter the evidentiary rules governing expert testimony, we held shortly thereafter that a medical examiner may offer an expert opinion regarding a victim's cause of death and related matters based on autopsy results without having been present for or conducted the autopsy. *Commonwealth* v. *Avila*, 454 Mass. 744, 762-763 (2009).[12]

Second, the defendant contends that our evidentiary rules

---

[12]While our common-law rules of evidence governing expert testimony differ in important ways from the Federal Rules of Evidence and other States' rules of evidence, we note that many Federal and State courts have reached the same conclusion that neither *Crawford* v. *Washington*, 541 U.S. 36 (2004), nor *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009) (*Melendez-Diaz*), bars an expert from testifying to an opinion that is based on testimonial hearsay. See, e.g., *United States* v. *Turner*, 591 F.3d 928, 932-934 (7th Cir. 2010); *United States* v. *Johnson*, 587 F.3d 625, 635 (4th Cir. 2009), cert. denied sub nom. *Martin* v. *United States*, 130 S. Ct. 2128 (2010); *United*

should be altered where an expert's opinion is based on chemical analysis rather than autopsy findings. Implicit in this argument is that, where a forensic science has developed to the point that the analysis of data yields an objective opinion, such as with the forensic use of DNA, rather than a subjective opinion that depends on the experience and judgment of the examiner, the distinction between the opinion and the underlying fact finding evaporates, because the opinion inevitably follows from the underlying facts.[13] We recognize that, where a DNA expert offers an opinion that a defendant (or victim) is included as a possible source of DNA, jurors who learn about the methodology of DNA forensic analysis from that expert may infer that the DNA profile of the defendant (or victim) matched exactly the DNA profile of the sample from the crime scene. The risk that a jury may infer facts not in evidence from an opinion that is admissible in evidence is not a reason to declare the latter inadmissible unless the unfair prejudice arising from the facts inferred substantially outweighs the probative weight of the

States v. Mejia, 545 F.3d 179, 198-199 (2d Cir. 2008); United States v. Lombardozzi, 491 F.3d 61, 72 (2d Cir. 2007); United States v. Henry, 472 F.3d 910, 914 (D.C. Cir.), cert. denied, 552 U.S. 888 (2007); Larkin vs. Yates, U.S. Dist. Ct. No. CV09-2034-DSF (CT) (C.D. Cal. July 9, 2009); Vann v. State, 229 P.3d 197, 207-211 (Alaska Ct. App. 2010); State v. Tucker, 215 Ariz. 298, 314, cert. denied, 552 U.S. 923 (2007); Roberts v. United States, 916 A.2d 922, 938-939 (D.C. 2007); Rector v. State, 285 Ga. 714, 715-716, cert. denied, 130 S. Ct. 807 (2009); People v. Lovejoy, 235 Ill. 2d 97, 142-146 (2009); Pendergrass v. State, 913 N.E.2d 703, 707-708 (Ind. 2009), cert. denied, 130 S. Ct. 3409 (2010); State v. Dilboy, 160 N.H. 135, [pp. 9-10 slip op.] (2010); State v. Lewis, 235 S.W.3d 136, 151 (Tenn. 2007); Blaylock v. Texas, 259 S.W.3d 202, 208 (Tex. Ct. App. 2008), cert. denied, 129 S. Ct. 2861 (2009); State v. Barton, 289 Wis. 2d 206, 215 (Ct. App. 2005).

[13]"Testing biological evidence in the laboratory involves the use of a logical sequence of analyses designed to identify what a substance is and then from whom it came." National Research Council, Strengthening Forensic Science in the United States: A Path Forward 130 (2009). "Although the forensic use of nuclear DNA is barely 20 years old, DNA typing is now universally recognized as the standard against which many other forensic individualization techniques are judged." Id. Similarly, "[t]he analysis of controlled substances is a mature forensic science discipline and one of the areas with a strong scientific underpinning." Id. at 134. In contrast, "the criteria for [fingerprint] identification are much harder to define, because they depend on an examiner's ability to discern patterns (possibly complex) among myriad features and on the examiner's experience judging the discriminatory value in those patterns." Id. at 140.

opinion. See generally *Commonwealth* v. *Mattei,* 455 Mass. 840, 850 (2010) (expert testimony regarding DNA test results subject to balancing of probative value and unfair prejudice). We conclude that the balance here weighs heavily in favor of admission of the opinion, and that the objective nature of the science underlying DNA analysis strengthens the opinion's probative weight and diminishes the risk of *unfair* prejudice. We reject the perverse implication of the defendant's argument that, the better the science, the less admissible the opinion.

We also reject the premise that, in DNA analysis, there is no meaningful distinction between the opinion and the underlying fact finding. "The human genome sequence is almost exactly the same (99.9%) in all people." Human Genome Program, U.S. Dep't of Energy, Genomics and Its Impact on Science and Society: A 2008 Primer 3 (2008). Therefore, the mere fact that the characteristics of certain alleles of a defendant's DNA matches the characteristics of alleles of DNA found at a crime scene says almost nothing about the likelihood that the defendant was present at the crime scene unless the jury learn from an expert about the nature of the DNA profile used.[14] "Evidence of a match based on currently used testing processes is meaningless without evidence indicating the significance of the match." *Commonwealth* v. *Lanigan,* 419 Mass. 15, 20 (1994). See *Commonwealth* v. *Mattei, supra; Commonwealth* v. *Rosier,* 425 Mass. 807, 813 (1997). Only an expert can testify to the likelihood that more than one person possesses a particular DNA profile, based on her knowledge of the alleles selected for the DNA profile and the mathematical probabilities that more than one person may possess the same characteristics of those alleles. See *Commonwealth* v. *Mattei, supra* at 855, quoting *Peters* v. *State,* 18 P.3d 1224, 1228 (Alaska Ct. App. 2001) (average juror has no knowledge of frequency of particular DNA profile).

The defendant also contends that, where the analyst who con-

---

[14]"To assess the probability that DNA from a randomly selected person has the same profile as the evidence DNA, we need to know the frequency of that profile in the population. That frequency is usually determined by comparison with some reference data set. A very small proportion of the trillions of possible profiles are found in any database, so it is necessary to use the frequencies of individual alleles to estimate the frequency of a given profile." National Research Council, The Evaluation of Forensic DNA Evidence 89-90 (1996).

ducts the DNA tests does not testify, the defendant is disadvantaged because he cannot cross-examine the testing analyst regarding the possibility of mislabeling or mishandling of the DNA, or outright manipulation of data or fraud. This practical limitation on the scope of cross-examination exists whenever any expert relies on the results of tests, experiments, or observations conducted by another. Nevertheless, we have permitted experts to do exactly this since *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 532 (1986). For instance, a medical examiner who offers an opinion at trial as to the cause of death but who did not conduct the autopsy (or see a videotape or photographs of the autopsy) cannot be effectively cross-examined as to whether the medical examiner who conducted the autopsy fabricated or manipulated the data, or erred in labeling the entry wound as an exit wound, or in measuring the length or breadth of tissue damage. These same inherent limitations exist where a DNA analyst who did not conduct the testing offers an opinion as to the significance of the results. The only difference is that, with DNA analysis, the testing techniques are so reliable and the science so sound that fraud and errors in labeling or handling may be the *only* reasons why an opinion is flawed. See National Research Council, Strengthening Forensic Science in the United States: A Path Forward 130 (2009) (because of reliability of forensic DNA analysis, "absent fraud or an error in labeling or handling, the probabilities of a false positive are quantifiable and often minuscule").

Our common-law rules of evidence protect a defendant in various ways from the risk of inaccurate forensic analysis. Where there is reason to believe that evidence has been mislabeled or mishandled or that data have been fabricated or manipulated, a defendant may challenge the admissibility of an expert opinion relying on such evidence or data in a *Daubert-Lanigan* hearing, because an opinion must rest on evidence or data that provide "a permissible basis" for an expert to formulate an opinion. *Department of Youth Servs.* v. *A Juvenile, supra* at 531. See *Commonwealth* v. *Sparks,* 433 Mass. 654, 659 (2001) (to preserve objections to scientific reliability of laboratory's DNA testing kits and database for formulating statistical frequencies, defendant must file appropriate pretrial motion and request hearing). A defendant may also challenge the admissibility of an opinion

where an expert relies solely on the conclusions of the testing analyst, without knowledge of the procedures employed by the testing analyst or the underlying data and evidence that are generally contained in worksheets, because a conclusory opinion alone may not be a permissible basis on which an expert may rest an opinion. Where an expert opinion survives a *Daubert-Lanigan* challenge or where, as here, the defendant does not challenge the admissibility of the expert's opinion, the defendant may still, as here, cross-examine the testifying expert as to the risk of evidence being mishandled or mislabeled, or of data being fabricated or manipulated, and as to whether the expert's opinion is vulnerable to these risks.

The defendant in this case had an adequate opportunity to cross-examine Lynch as to these risks. Lynch had trained Delatore, served as her supervisor, conducted a full technical review of her DNA reports regarding the testing that was performed and the results of testing, and signed her reports. While Lynch admitted that she did not observe Delatore perform the DNA testing, and therefore did not have personal knowledge of how Delatore conducted the testing, she was familiar with the protocols Delatore was taught to employ, Delatore's documentation of her work, and Delatore's work history.[15]

Furthermore, defense counsel's cross-examination of Lynch elicited that she had not performed the testing in the present case and that she therefore had "no idea" whether the results were accurate. In this sense, the defendant actually benefited from the absence of Delatore in that he could undermine Lynch's testimony by showing that she could not be sure there were no flaws in Delatore's work without establishing that there were any actual flaws. See *United States* v. *Moon*, 512 F.3d 359, 361 (7th Cir.), cert. denied, 129 S. Ct. 40 (2008).

Having concluded that it was error to admit in evidence Lynch's testimony regarding Delatore's opinion and factual

---

[15]We do not suggest that, where the analyst who performed the testing is unavailable, only the analyst's supervisor may offer an opinion based on the analyst's work product, but we recognize that the analyst's supervisor is often the person who is most familiar with the analyst's performance of her duties. Here, Lynch was "perhaps the ideal witness, against whom to lodge . . . challenges" to "systemic problems with the laboratory processes," about which only someone in a supervisory position like hers might be aware. *Pendergrass* v. *State*, 913 N.E.2d 703, 708 (Ind. 2009).

findings, and the table summarizing those factual findings, we turn to the question whether these errors require a new trial where Lynch's opinion was properly admitted. The defendant did not object to the admission of this testimony or otherwise preserve his claim of error, so the error must be examined under the miscarriage of justice standard.[16] See *Commonwealth* v. *Avila*, 454 Mass. 744, 763 (2009) (unpreserved error on Sixth Amendment grounds reviewed for substantial likelihood of miscarriage of justice). In examining whether an unpreserved error created a substantial likelihood of a miscarriage of justice, we consider the totality of evidence admitted at trial. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 395 (2008), citing *Commonwealth* v. *Montez*, 450 Mass. 736, 750 (2008).

The defendant is correct that the DNA evidence was particularly harmful to his defense of misidentification. The most probative aspect of this evidence, however, was Lynch's opinion that Serret was included as a possible source of the bloodstain on the defendant's boot and pant leg, and that the likelihood that someone other than Serret was a source was infinitesimal. We allow expert testimony in the realm of DNA evidence specifically because it is the type of "scientific, technical, or other specialized" field that "lies outside of common experience." Mass. G. Evid. § 702 & Note at 217, 220 (2010), quoting *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 581 (1998). Without Lynch's expert interpretation and analysis, neither the admission of the results table in evidence nor Lynch's description of the information contained in it was particularly meaningful. Having considered Lynch's opinion, which defense counsel ably cross-examined, as well as

---

[16]The defendant contends that, because the trial ended before the United States Supreme Court granted certiorari in *Commonwealth* v. *Melendez-Diaz*, 69 Mass. App. Ct. 1114 (2007), the standard of review should be harmless beyond a reasonable doubt. He argues that, in light of our decision in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005), where we concluded that drug certificates were not testimonial statements within the meaning of the confrontation clause of the Sixth Amendment, it would have been futile to have objected because the judge was required to follow the *Verde* decision. See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 356-358 (2010). As we have noted, the admission of Cheryl Delatore's opinion and factual findings through Lynch's expert testimony was contrary to the limits we imposed on expert testimony in *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516 (1986), so the defendant's objection to this testimony would not have been futile.

the other overwhelming evidence against the defendant, we conclude that no substantial likelihood of a miscarriage of justice resulted from the improper admission of Delatore's results table, or Lynch's testimony regarding Delatore's results and opinion. See *Commonwealth* v. *Griffith,* 404 Mass. 256, 260 (1989), quoting *Commonwealth* v. *Shine,* 398 Mass. 641, 655 (1986) (where "evidence of guilt . . . was overwhelming," no substantial likelihood of miscarriage of justice).

*Prior bad act evidence.* The defendant next challenges the introduction of Carbuccia's testimony that he and Serret witnessed the defendant kill another man roughly two weeks before the defendant allegedly shot them. Prior to trial, defense counsel filed a motion in limine to exclude this "prior bad act" evidence as unfairly prejudicial. The judge conducted a voir dire of Carbuccia and determined that he could give limited testimony regarding the prior shooting because it was probative of motive.[17] When Carbuccia testified before the jury, defense counsel objected on the same grounds as the motion in limine, and the objection was overruled in light of the judge's earlier ruling.

"It is long established that evidence of uncharged criminal acts or other misbehavior is not admissible to show a defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as 'common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive.' " *Commonwealth* v. *Dwyer,* 448 Mass. 122, 128 (2006), quoting *Commonwealth* v. *Marshall,* 434 Mass. 358, 366 (2001). See Mass. G. Evid., *supra* at § 404 (b), at 46-47. The rule against prior bad act evidence reflects the "inherent danger" that the jury will assume that, because the defendant has "previously misbehaved, indictably or not," he must have committed the crime charged. *Commonwealth* v. *Baker,* 440 Mass. 519, 529, 530 (2003), quoting *Commonwealth* v. *Trapp,* 396 Mass. 202, 206 (1985), *S.C.,* 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996). However, unless the probative value of the evidence is substantially outweighed by the risk of unfair prejudice to the defendant, the evidence

---

[17]The judge ruled that Carbuccia could not testify that the girl friend and children of the victim of the alleged prior shooting were present at the time, and instructed the prosecutor to lead Carbuccia if necessary to avoid this prejudicial testimony.

may be admissible for a permissible purpose, such as to prove that a defendant had a motive to commit the crime. See *Commonwealth* v. *Holliday*, 450 Mass. 794, 815-816, cert. denied sub nom. *Mooltrey* v. *Massachusetts*, 129 S. Ct. 399 (2008). We review the decision of the judge to admit evidence of a prior bad act to establish the defendant's motive under the abuse of discretion standard. See *Commonwealth* v. *Sharpe*, 454 Mass. 135, 143 (2009).

The judge did not abuse her discretion. The record reflects that she appropriately balanced the probative weight of the evidence with the risk of unfair prejudice, and prudently determined that the prior bad act evidence was admissible for a limited purpose only. The evidence that Serret and Carbuccia had witnessed the defendant shoot someone else was not introduced to show the defendant's bad character, but to explain why the defendant would decide to shoot Serret and Carbuccia two weeks later. Without this evidence of motive, the shootings of Serret and Carbuccia might have appeared to the jury "essentially inexplicable act[s] of violence." *Commonwealth* v. *Mendes*, 441 Mass. 459, 464 (2004), quoting *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269 (1982). From Carbuccia's testimony, the jury reasonably could have inferred that the defendant was aware that Serret and Carbuccia had witnessed the September 21 shooting, that he was so concerned they would reveal his involvement to the police that he telephoned Serret thirty-seven times between September 23 and September 27, and that he ultimately decided that the only way to ensure their silence was to kill them. See *Commonwealth* v. *Drew*, 397 Mass. 65, 79-80 (1986) (evidence that victim was eyewitness to defendant's involvement in earlier murder admissible to show defendant's motive). We conclude that the judge did not err in admitting the prior bad act evidence as probative of motive.

In response to a request by defense counsel, the judge gave a strong instruction regarding the limited purpose for which the jury could use the prior bad act evidence, both after Carbuccia's testimony and again in her final instructions to the jury after the closing arguments.[18] This instruction was taken virtually verbatim

---

[18] After Carbuccia's testimony, the judge instructed the jury:

"Now you have just heard mention of a previous shooting allegedly

from defense counsel's request, and counsel did not object either time it was given.[19] The defendant now argues that the instruction constituted reversible error because the judge did not explicitly state that the jury must believe that the prior shooting occurred before they could use the evidence for the limited purpose of showing motive.[20] Because the defendant did not object to the instruction at trial, we review the omission to determine whether it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Mercado*, 456 Mass. 198, 205 n.14 (2010).

We are not persuaded that the instruction now claimed to be essential by the defendant would have told the jury anything they did not know. If the jury did not believe that the September

on September 21, 2004, and allegedly done by [the defendant]. I instruct you that you may not take that as a substitute for proof that the defendant committed the crimes that he is charged with here, nor may you consider it as any evidence that the defendant has a criminal personality or bad character.

"You may consider it solely on the limited issue of whether or not [the defendant] had a motive to commit the crimes charged in the indictments here, that is the events that allegedly occurred on October 6, 2004. You may not consider the evidence that you just heard of the prior shooting for any other purpose.

"Specifically you may not use it to conclude that if the defendant committed the shooting of September 21, 2004, he must also have committed the offenses that he is charged with here.

"I caution you in considering this evidence that the defendant is not on trial for anything arising out of events of September 21 of 2004, and you are not to consider the evidence . . . as a substitute for proof of the guilt of the offenses for which he stands charged in this case.

"You may use the evidence that you just heard only for the limited purpose that I have just explained to you. Now in addition, in considering the prior shooting, you the jury, must be satisfied as to the accuracy of the identification of [the defendant] as the perpetrator of that shooting before you may consider this evidence at all."

The judge repeated this instruction almost verbatim in her closing instructions.

[19] The instruction also closely mirrored Massachusetts Superior Court Criminal Practice Jury Instruction § 4.20.2 (Mass. Continuing Legal Educ. 1999 & 1st Supp. 2003), and Instruction 3.760 of the Criminal Model Jury Instructions for Use in the District Court (2009).

[20] The defendant urges us to adopt the following instruction: "It is for you to decide whether to believe this evidence and you cannot even consider it unless you believe it."

21 shooting occurred, they would not have relied on the evidence of the September 21 shooting to establish motive.[21,22]

The defendant claims that, by failing to give this instruction, the judge invaded the province of the jury to determine the weight and credibility of the prior bad act evidence. We disagree. The judge did not suggest to the jury in her limiting instruction that she believed the defendant had committed the prior bad act or that the jury need not assess the weight and credibility of Carbuccia's testimony regarding the alleged prior shooting. Not only, in the first sentence of her limiting instruction, did she refer to an alleged prior shooting "allegedly done by [the defendant]," but she added in the final sentence of the instruction that the jury "must be satisfied as to the accuracy of the identification of [the defendant] as the perpetrator of that shooting before you may consider this evidence at all." This final sentence alone sufficed to ensure that the jury would first decide whether

---

[21] The instruction the defendant seeks — that the jury "cannot even consider" this evidence unless they believe it — would be error. If the jury were to disbelieve Carbuccia's testimony that the defendant shot another person on September 21, they would be free to consider Carbuccia's fabrication of evidence in evaluating his testimony about the shooting of Serret and himself. See *Commonwealth* v. *Manning*, 367 Mass. 605, 607 (1975) (if jury disbelieved important part of witness's testimony, then "this disbelief could quite naturally have led the jury to disbelieve the [witness's] further testimony").

[22] The defendant argues that the relevance of a prior bad act depends on the fulfilment of a condition of fact, and is admissible only if the judge finds by a preponderance of the evidence that the prior bad act occurred and that the defendant committed the act. See *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 126-127 (2000). See generally Mass. G. Evid. § 104 (b) (1), at 11 (2010). The defendant then quotes the Mass. G. Evid., *supra* at § 104 Note at 13, that, "[a]fter making certain preliminary findings of facts in criminal cases, the judge must instruct the jurors to disregard the evidence if they do not believe that the preliminary facts exist." This instruction is required only where the preliminary fact is something other than the actual occurrence of the act at issue, where the jury otherwise might consider the act despite finding that the preliminary fact did not exist. For instance, a jury must be instructed that, before considering statements by a joint venturer, they must find on the basis of the other evidence, not including those statements, that a joint venture existed and that the statements were made during the joint venture and in furtherance of its goals; the jury need not be instructed that they must find that the statements were made before considering them. See *Commonwealth* v. *Collado*, 426 Mass. 675, 681-682 (1998); *Commonwealth* v. *Boyer*, 52 Mass. App. Ct. 590, 598 (2001). See also *Commonwealth* v. *Key*, 381 Mass. 19, 22-23 & n.1 (1980) (to consider dying declaration, jury must first find that victim was aware of impending death).

they believed the prior bad act evidence before they inferred motive based on it. Because there was no error, we need not consider whether it created a substantial likelihood of a miscarriage of justice.

*Serret's mother's testimony that Serret and Carbuccia said they "saw something."* Serret's mother testified that, on "roughly" the night of September 21, 2004, Serret and Carbuccia came to her house. The prosecutor asked her whether she remembered them telling her "that they saw something that night." Over defense counsel's objection, she answered simply, "Yes."[23] The defendant argues that this evidence was inadmissible. We conclude that the evidence was admissible as a prior consistent statement by Carbuccia.

Generally, a prior statement by a witness that is consistent with his trial testimony is inadmissible. See *Commonwealth* v. *Novo*, 449 Mass. 84, 93 (2007). However, if a witness is impeached on cross-examination by a claim of recent contrivance or inducement, a statement that he made before he had an incentive to fabricate his testimony may be admitted. See *id.* See generally Mass. G. Evid., *supra* at § 613 (b), at 201-202, 205-206. It is within the judge's discretion to determine whether a claim of recent contrivance exists and whether to admit the witness's prior consistent statement "when he has been *or will be impeached* with an inconsistent statement" (emphasis added). *Commonwealth* v. *Saarela*, 376 Mass. 720, 723 (1978), citing *Commonwealth* v. *Zukoski*, 370 Mass. 23, 27 (1976).

At trial, Serret's mother testified before Carbuccia took the stand. Nonetheless, it was clear from defense counsel's opening statement that he planned to impeach Carbuccia with the prior statement that he made to the police and grand jury shortly after October 6 in which he denied having seen the September 21 shooting.[24] It was also clear that defense counsel intended to suggest that Carbuccia developed a motive to lie on account of

---

[23]The judge did not state the ground for overruling the objection.

[24]Defense counsel told the jury, "What you'll also hear about Mr. Carbuccia is that he testified under oath in another proceeding shortly after this incident that, again this was more than two years ago, and he testified under oath when asked: 'Did you witness this prior shooting, this so-called motive?' 'No.' He didn't see it, it was around the corner. Didn't see who did that. Under oath he said that."

the financial and housing assistance he received from the district attorney's office.[25] In a similar case, we held that it was not an abuse of discretion for the judge to allow two witnesses to testify to their earlier consistent statements where "[d]efense counsel made plain in his opening statement that he would attack the credibility of the witnesses, and on cross-examination did impeach them . . . ." *Commonwealth* v. *Rivera*, 430 Mass. 91, 100 (1999). See *Commonwealth* v. *Martinez*, 425 Mass. 382, 397 (1997), quoting *Commonwealth* v. *Saarela, supra* (witness made number of inconsistent statements in past and subsequently entered plea agreement, making claim of recent contrivance "unavoidable" or "inevitable"). That a prior consistent statement is introduced before defense counsel has an opportunity to impeach the witness is "not, however, determinative" of whether that statement may be properly admitted. *Commonwealth* v. *Knight*, 437 Mass. 487, 497 (2002). Because it was obvious here that defense counsel would impeach Carbuccia on cross-examination regarding the September 21 shooting, the judge had "wide discretion" to admit Carbuccia's prior consistent statement to Serret's mother on September 21 that he and Serret "saw something" earlier that evening. *Id.*, quoting *Commonwealth* v. *Saarela, supra.*

The defendant did not request and the judge did not give a limiting instruction informing the jury that they may consider this testimony only in evaluating whether Carbuccia's testimony at trial regarding the September 21 shooting was recently contrived. See *Commonwealth* v. *Rivera, supra* (defendant entitled, on request, to limiting instruction). The judge's failure to give such an instruction sua sponte did not result in a substantial likelihood of a miscarriage of justice. *Id.*

*Unequivocal, post-Miranda denials of guilt.* Detective Harris interviewed the defendant at the Boston police headquarters on the night of his arrest. He read the defendant his Miranda warnings, and the defendant initialed and signed a form saying that he had been advised of his rights. On direct examination at

---

[25]Defense counsel said, "You will also hear some other interesting information, testimony about Mr. Carbuccia, that he was paid a significant amount of money by the Commonwealth, that he is currently staying in a hotel at the Commonwealth's expense."

trial, Detective Harris testified that during the interrogation the defendant denied the accusations against him:

> "I told him that the sewer was currently being searched and I asked him to tell me what happened. I said: 'Were you involved in something that occurred up there?' He told me, he continuously and repeatedly denied throwing anything in the sewer and having anything to do with that. I then went on to tell him that there were two people shot in that particular neighborhood and I essentially was asking him what happened, was he in a fight? That he'll feel better if he can get it off his chest, tell me what occurred up in that area. Again, he denied any involvement in the shooting and he denied any involvement whatsoever with throwing anything into the sewer."

Defense counsel did not object to this testimony at trial. On appeal, the defendant argues that his unequivocal, post-Miranda denials of guilt should have been excluded. The Commonwealth concedes the error but asserts that it did not create a substantial likelihood of a miscarriage of justice.

In *Commonwealth* v. *Womack, ante* 268, 276 (2010), we recognized that, where a defendant's general denial of an accusation is admitted in evidence in error, "[t]he core of any prejudice is more likely caused by admission of the accusation[] than the denial[]," because a detailed accusation improperly puts in evidence the Commonwealth's version of the facts, whereas it is "generally of great value" to a defendant for a jury "to hear evidence of his prompt, clear, and emphatic denial[] without his having to testify." *Id.* Here, Detective Harris's statements and the defendant's denials were inadmissible hearsay, but their introduction in evidence did not create a substantial likelihood of a miscarriage of justice. Detective Harris's questioning of the defendant was more inquisitive than inquisitory. The facts of the case that his questions conveyed — two people were shot, and a search of the sewer occurred — were cumulative of other evidence and were stated only briefly and in general terms. See *id.* at 275. The defendant's denials actually supported and were consistent with his defense that he was misidentified as a suspect. See *Commonwealth* v. *Diaz*, 453 Mass.

266, 274 (2009) ("premise of the defense was misidentification; evidence of the defendant's denial did not harm the defendant's case in this regard"). It is perhaps for this reason that defense counsel did not object, did not move to strike the testimony, and did not seek a curative instruction. See *Commonwealth* v. *Kirwan*, 448 Mass. 304, 315 (2007) (where "error was, in a sense, invited . . . rather than creating a substantial likelihood of a miscarriage of justice, it benefited the defendant" [citation omitted]).

*DiGiambattista instruction*. Detective Harris's interrogation of the defendant was not tape recorded. Prior to the final charge conference, defense counsel requested that a jury instruction based on *Commonwealth* v. *DiGiambattista*, 442 Mass. 423 (2004) (*DiGiambattista*), be given. In *DiGiambattista*, we held pursuant to our supervisory powers:

> "[W]hen the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care."

*Id.* at 447-448.[26]

In response to defense counsel's request, the judge said she would instruct the jury to exercise "great caution and care" in weighing the interrogation evidence, but would not say that "the State's highest court has expressed a preference" for tape-recorded interviews. In her charge to the jury, the judge instructed:

---

[26]Where voluntariness is a live issue at trial and the humane practice instruction is given, we also require that the jury be instructed "that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 448 (2004). This instruction was not required here because the voluntariness of the defendant's statements to the police was not a live issue.

"[I]n this case, you have heard some evidence that the police allegedly interrogated the defendant at police department headquarters on October 6, 2004, and that that alleged interrogation was not tape recorded.

"Let me inform you, ladies and gentlemen, that because of the absence of any recording of the interrogation in this case, you should weigh that evidence with great caution and care."

At the conclusion of the charge, defense counsel objected and once more requested the full *DiGiambattista* instruction. The judge declined to give it. On appeal, the defendant claims that the failure to give the complete instruction was prejudicial error. See *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994) ("Because the issue was properly preserved, we review to determine whether we can be certain that the improper instruction 'did not influence the jury, or had but very slight effect' ").

We agree that the judge erred in giving only the second part of the requested instruction. *DiGiambattista* is clear that, where the defendant requests the instruction, the judge must tell the jury both that (1) the State's highest court prefers that custodial interrogations be tape recorded, whenever practicable, and (2) where there is not at least an audiotape recording of the complete interrogation, the jury should weigh the defendant's statements with great caution and care. We do not consider the first part of this instruction to be extraneous.

While the instruction is mandatory, see *id.* at 448, we have not required that the precise language of the instruction be used, see *Commonwealth* v. *Boyarsky*, 452 Mass. 700, 710 (2008); nor do we do so now. The judge here, however, did not simply use different words to convey the same meaning. Her giving only one-half of the instruction denied the defendant his entitlement to the full instruction.

In the context of this case, however, the error was not prejudicial. The defendant's unrecorded statements were some of the weakest evidence against him. Most of what the defendant said was self-serving. The only statements he made that strengthened the prosecution's case were his shifting versions of whether he had

been coming from or going to the bar on Shirley Street, and whether he had been on Marshfield Street that night, as well as his claim that he ran from police because he believed he had an outstanding warrant for his arrest based on a motor vehicle violation, when he had no such warrants. We can be certain that the improper instruction did not influence the jury because, even if the jury had disregarded the defendant's statements entirely, we are convinced they would still have convicted the defendant based on other overwhelming evidence.

*Autopsy photograph.* Finally, the defendant claims that the judge abused her discretion in admitting a redacted autopsy photograph of a portion of Serret's skull. The defendant argues that, because the medical examiner testified that the injuries to Serret's skull were sustained after the cessation of life, the extent of those injuries was irrelevant to whether the murder was committed with extreme atrocity or cruelty. The defendant asserts that, because it was not probative of a material issue in dispute, it was unfairly prejudicial to admit the photograph in evidence.

The photograph was relevant to the issue of extreme atrocity or cruelty, because it indicated the amount of force applied and the extent of the injuries inflicted. See *Commonwealth* v. *Boateng*, 438 Mass. 498, 507 (2003); *Commonwealth* v. *Ramos*, 406 Mass. 397, 406-407 (1990). Under *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), the jury may consider various factors in deciding whether a murder was committed with extreme atrocity or cruelty, including the "extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." The photograph depicting a depressed skull fracture was highly probative of the extent of Serret's injuries, the number of blows he sustained, and the manner and force with which these blows were delivered, as well as the gross disproportion between the means needed to cause death and those employed. The fact that Serret's heart stopped beating before the blows were inflicted does not negate the relevance of these blows in determining whether the murder was committed with extreme atrocity or cruelty because the defendant may not have known that Serret was dead when he repeatedly struck him. See *Commonwealth* v. *Boateng*, *supra* at

511-512 (evidence that defendant strangled and kicked baby boy after throwing him to floor relevant to theory of extreme atrocity or cruelty even if hitting floor alone caused death); *Commonwealth* v. *Eugene*, 438 Mass. 343, 354-355 (2003) (multiple stab wounds, including some inflicted after victim was already dead, gave jury "ample basis on which to conclude that the killing was committed with extreme atrocity or cruelty").

Where photographic evidence is relevant and properly authenticated, its admissibility is left to the discretion of the judge. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 803 (2002). "This court has almost never ruled that it was error to admit photographs of crime scenes and homicide victims." *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999). See *Commonwealth* v. *Richmond*, 371 Mass. 563, 566 (1976) (reversing murder conviction because of prejudice arising from photographs showing postmortem mutilation of victim's body by dog, but declaring that "we have never, so far as we know, upset a verdict on this type of error, and this opinion is not to be taken to indicate that we are likely to do so again"). There was no error here. The judge acted well within her discretion in deciding that the probative value of the photograph after it was substantially redacted to narrow the scope of the injuries it depicted outweighed the risk of unfair prejudice.[27]

*Review under G. L. c. 278, § 33E.* Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we address one final issue. During the individual voir dire to empanel the jury, the judge appeared to use a procedure by which the Commonwealth and the defendant alternated who went first in exercising a peremptory challenge. However, only a few times did the judge verbally indicate which party was first, and generally one of the parties would either offer that it was content or exercise a challenge without prompting by the judge. The defendant did not object to this procedure at trial or on appeal.

[27]The judge did not instruct the jury "that the photograph is to be used in analyzing the evidence and is not designed to elicit sympathy." *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999). However, such an instruction is not required, and here the defendant did not request it. See *Commonwealth* v. *Allison*, 434 Mass. 670, 684-685 n.11 (2001).

In *Commonwealth* v. *Vuthy Seng*, 456 Mass. 490, 493-496 (2010), where a judge used essentially the same procedure in individual voir dire as here, we declared that "novel procedures, such as the one followed in this case, raise the possibility of prejudicial error." *Id.* at 494-495 n.6. Yet, we concluded that, the use of the procedure in that case did not violate Rule 6 of the Rules of the Superior Court (LexisNexis 2008-2009), the Massachusetts Declaration of Rights, or the United States Constitution. *Commonwealth* v. *Vuthy Seng*, *supra* at 494-496. Likewise, here, the defendant was not denied the peremptory challenges to which he was procedurally entitled and thus "cannot complain that he was prejudiced by the voir dire procedure or that it raises a substantial likelihood of a miscarriage of justice."[28] *Id.* at 496. See also *Commonwealth* v. *Hinds*, *ante* 83, 92-93 (2010).

After our review of the record, we discern no error, considered alone or collectively, that provides a just basis to set aside or reduce the verdict of murder in the first degree.

*Judgments affirmed.*

---

[28]At the beginning of the second day of jury empanelment, one of the jurors who had been selected the day before was dismissed due to illness. The judge then said that each party would be allowed an additional peremptory challenge. However, when the defendant exercised his fifteenth peremptory challenge, the clerk agreed with him that he had only one, not two, challenges left. Because the defendant still received and used the sixteen peremptory challenges to which he was entitled under Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979), this likely unintentional mistake on the part of the clerk was not error.