## COMMONWEALTH vs. KEITH TASKEY.

No. 09-P-689.

Hampden. April 14, 2010. - February 18, 2011.

Present: KATZMANN, MEADE, & SIKORA, JJ.

*Deoxyribonucleic Acid. Conspiracy. Practice, Criminal,* Confrontation of witnesses, Instructions to jury, Hearsay. *Evidence,* Hearsay, Expert opinion, Conspiracy. *Constitutional Law,* Confrontation of witnesses.

At the trial of an indictment charging conspiracy to tamper with a deoxyribonucleic acid (DNA) record, testimony by a DNA analyst other than the one who had originally processed the defendant's DNA samples as to her independent analysis and opinion of the DNA results, during which a chart of test results from the original analyst was erroneously admitted, did not cause the defendant to suffer a harmful deprivation of his right of confrontation under the Sixth Amendment to the United States Constitution, where the defendant had an opportunity to cross-examine the testifying analyst on her own observations, and where the erroneous admission of the chart of test results was marginal, cumulative, and harmless beyond a reasonable doubt, in light of the exceptional reliability of the opinion of the testifying analyst (who was the supervisor of the absent analyst), the supportive circumstantial evidence of the defendant's guilt, and the defendant's ample opportunity for cross-examination. [792-797]

The evidence before a grand jury amply permitted them to find probable cause that a criminal defendant had conspired with another to tamper with a deoxyribonucleic acid record in violation of G. L. c. 274, § 7. [797-798]

The body of circumstantial evidence at a criminal trial, viewed in the light most favorable to the Commonwealth, supported the inference, beyond a reasonable doubt, that the defendant had conspired with another to tamper with a deoxyribonucleic acid record in violation of G. L. c. 274, § 7. [798-799]

The evidence at a criminal trial did not warrant a jury instruction on the defense of accident. [799]

INDICTMENT found and returned in the Superior Court Department on February 23, 2007.

A motion to dismiss was heard by *Peter A. Velis,* J., and the case was tried before *Tina S. Page,* J.

*Andrew S. Crouch* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

SIKORA, J. The defendant appeals from a Superior Court jury conviction of conspiracy to tamper with a deoxyribonucleic acid (DNA) record, G. L. c. 274, § 7. He argues that the allowance of testimony by a DNA analyst violated his constitutional right of confrontation, that insufficient evidence supported both his indictment and conviction, and that the judge wrongly refused to give an accident instruction to the jury. For the following reasons, we affirm.

*Background.* 1. *Grand jury proceeding.* A grand jury indicted defendant Keith Taskey and codefendant Kenneth Langlais[1] for conspiracy to tamper with a DNA record in violation of G. L. c. 274, § 7.[2] The Commonwealth presented the following evidence to the grand jury.[3]

In 2005, the defendant and Langlais resided in the same cellblock during their incarceration at the Hampden County house of correction (Hampden). They were required to provide DNA samples for entry into the State DNA database, or the Combined DNA Index System (CODIS) database.[4] Collection of DNA samples was scheduled for February 25, 2005, for the defendant and April 12, 2005, for Langlais.

As part of the DNA collection process, CODIS staff, with the help of jail staff, match information on an inmate's identification bracelet bearing the inmate's name, date of birth, identification number, and photograph, to inmate identification information on a DNA collection list.[5] Inmates were able to remove these bracelets. After matching bracelet identification information with the list, CODIS staff complete an inmate DNA identification card

---

[1]Codefendant Kenneth Langlais initially appealed from his conviction and subsequently moved to withdraw his appeal. His appeal was dismissed with prejudice.

[2]The grand jury also indicted the defendant for one other offense, tampering with a DNA record, G. L. c. 22E, § 14. The count of tampering with a DNA record was severed, and trial proceeded on the conspiracy count. Although the jury found the defendant guilty of conspiracy, the Commonwealth subsequently filed a nolle prosequi on the count of tampering with a DNA record.

[3]The Commonwealth submitted the testimony of a State police trooper and eleven exhibits to the grand jury.

[4]Pursuant to G. L. c. 22E, § 3, convicted felons must provide a DNA sample for input into the CODIS database.

[5]The bracelets are often in poor condition, and the pictures on the bracelets can be grainy and unclear.

(DNA card) based upon inmate answers to questions about the inmate's name, alias, Social Security number, place of residence, race, and gender; the inmate's identification number, also inscribed onto the DNA card, is taken from the inmate's bracelet. CODIS staff then take and impress the inmate's thumbprint on the DNA card and extract a blood sample. The DNA card and blood sample constitute a kit, which carries a unique identification number. An independent laboratory analyzes the DNA profile of each sample for entry into the CODIS database.

On February 25, 2005, the defendant provided a DNA sample and thumbprint (kit #38184, identification #123470). On April 12, 2005, staff personnel collected a DNA sample and thumbprint purportedly from Langlais; the DNA card for his sample indicated that he had shown his identification bracelet (kit #41343, identification #136408). Later analysis of the April 12 sample, however, revealed that the DNA sample and thumbprint belonged to the defendant, not Langlais.[6] On August 17, 2005, Langlais provided a DNA sample and thumbprint at the Berkshire County house of correction, which did not match the April 12 sample which he had allegedly provided.

2. *Trial.* At trial the evidence of the circumstances surrounding the sample collections taken on February 25 and April 12 mirrored the information submitted to the grand jury. The following additional evidence developed.

When collecting inmate DNA samples, CODIS staff set up tables within a living unit, or pod, within the jail. Inmates enter the pod for DNA sampling and assemble in a line. Jail staff assist CODIS staff by filling out paperwork during the sample collection.

On February 25, 2005, Michael Perkins, Hampden classification manager, assisted CODIS staff with the DNA collection. He filled out the DNA card for the defendant, who then resided in cellblock unit B1.

On April 12, Perkins filled out the DNA card for the inmate

---

[6]The DNA profiles of the February 25 and April 12 samples were identical. Only identical twins have identical DNA profiles. The defendant and Langlais are not identical twins.

No two individuals have the same fingerprints. The defendant's thumbprint exemplar of February 25 matched the thumbprint taken on April 12. As noted, Langlais's alleged thumbprint of April 12 did not match the one taken from him on August 17.

who identified himself as Langlais. Both Langlais and the defendant then resided in cellblock unit C5 at Hampden.[7] Cellblock unit members had access to one another. CODIS staff member Kelly King collected the DNA samples and fingerprints of the individuals scheduled for collection that day, including the inmate professing to be Langlais. As part of the collection process, Perkins entered the inmate's identification number on the DNA card and asked each inmate identifying questions to ensure that he was speaking to the right individual. King testified that she would match the identification number written on the DNA card with the number on the inmate's bracelet. She stated that she would refuse a DNA sample from any inmate who lacked photographic identification.

Debbie McKillop, State police crime laboratory analyst, tested and analyzed the DNA samples belonging to the defendant and ostensibly to Langlais, resulting respectively on February 25 (kit #38184) and April 12 (kit #41343); she created a report and chart based upon the results of her testing and analysis of those samples.[8] Because McKillop was unable to testify at trial,[9] Sharon Walsh, a crime laboratory "technical leader" overseeing the DNA and CODIS units and supervisor of McKillop, testified instead.[10] She had worked in the field of DNA processing for nine years. On direct examination, Walsh stated that in 2007 Mc-Killop had processed the two samples and had produced a report; the resulting data appeared on a chart exhibited at trial.[11] She explained also that she had "reviewed all of the data in the file and the report that was created" by McKillop.

More specifically, Walsh reported that she had examined the worksheets used by McKillop to reach the DNA profile results

[7]While the defendant and Langlais resided within the same cell unit, they did not live in the same cell: the defendant lived in cell eighteen and Langlais in cell thirteen.

[8]An outside laboratory first analyzed the kits. McKillop, however, conducted her own testing and analysis of the blood samples of the February 25 and April 12 kits.

[9]At the time of trial, McKillop resided in California and was unable to attend as a witness.

[10]Both the defendant and codefendant Langlais objected to Walsh's testimony; the judge overruled the objections.

[11]The Commonwealth entered the chart into evidence after Walsh concluded her testimony and without objection from the defendant.

and had reviewed other related data to "make sure the data was accurate to what was reported on [McKillop's] chart." The prosecutor asked Walsh whether she agreed with McKillop's findings, but the judge sustained the defendant's objection to that question. Walsh testified further that the DNA profiles of both the February 25 and April 12 samples were identical, which, she elaborated, meant that the samples were taken from identical twins or from the same individual.

On cross-examination, counsel for the defendant and Langlais questioned Walsh about errors attributed to the State police crime laboratory by the United States Department of Justice and a private firm in two separate audits during 2007. Walsh conceded that those audits had revealed two errors. In the first instance, the same DNA profile had entered the CODIS database under two different identification numbers; Walsh explained that the duplicate profile entered because of a typographical error. The second error involved a DNA profile entered into CODIS with fewer identifying DNA variables, or loci, than required; Walsh explained that the national CODIS database requires the matching of at least ten loci for DNA profiles entered into its system, that the State CODIS system requires fewer than ten loci, and that in that instance the profile should not have entered the national database system because of the discrepancy between national and State profiling requirements. She testified further that those errors were irrelevant to her analysis in this case because no typographical error had occurred in the processing of the two samples and because the DNA profile results were based upon sixteen matching loci.[12]

Before and during trial, the defendant moved to dismiss the charges against him and moved for a required finding of not guilty; a motion judge and the trial judge, respectively, denied the motions. The jury found the defendant guilty of conspiracy to tamper. The judge sentenced him to a two-year term of incarceration.

*Analysis.* On appeal, the defendant argues that the allowance of testimony by a DNA analyst other than the one who had

---

[12]Walsh was certain that no typographical error occurred because the outside laboratory used for testing DNA samples entered information electronically, not manually, and because she was able to examine the electronic data of the profiles and compare them to McKillop's chart to ensure their accuracy.

originally processed the DNA samples violated his right of confrontation under the Sixth Amendment to the United States Constitution.[13] He contends also that the evidence was insufficient to establish probable cause for the grand jury's indictment and insufficient to show his guilt beyond a reasonable doubt at trial. Finally, he contends that the judge wrongly refused his request of an accident instruction to the jury.

1. *Analyst testimony.* According to the defendant, Walsh, who did not conduct the original processing and analysis of the April 12 DNA sample, "merely read the results of McKillop's testing and . . . could not testify about the methods and practices employed to achieve the results." Because Walsh testified to her independent analysis and opinion of the DNA profile results and because the defendant had the opportunity to cross-examine her, no constitutional violation occurred in the admission of her opinion testimony.

The confrontation clause of the Sixth Amendment prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004). In *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009), the United States Supreme Court held that drug certificates qualified as out-of-court testimonial statements. Consequently their admission in evidence against a criminal defendant triggers his right "to be confronted" with the analyst at trial, unless the analyst is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. *Id.* at 2531. The parties here do not dispute that the evidence of the DNA profile results is testimonial, but rather dispute whether the admission of Walsh's testimony about that evidence offends the defendant's right of confrontation because Walsh did not conduct the original analysis and testing of the DNA sample.

In this case, supervisor Walsh testified that she had reviewed the course of analyst McKillop's work and had verified its

---

[13]The defendant has not pursued a claim of violation of his right of confrontation under art. 12 of the Massachusetts Declaration of Rights. Its protection is "coextensive" with the guarantee of the Sixth Amendment. *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006).

compliance with procedural protocols. As a starting point, she had examined the computerized data delivered to the State laboratory from the private testing laboratory which had received the blood samples of the defendant and Langlais. The State laboratory had then conducted a "retest" of the blood samples attributed to the two individuals. Walsh explained the testing process. The repeated test confirmed the match of all sixteen depicted loci of the DNA molecule found in the two separate samples. Walsh had followed the development of the information by McKillop to a DNA profile picture known as an electropherogram and then to a chart illustrating the identity of the sixteen loci. Walsh had reviewed all the raw data and all McKillop's worksheets in the creation of the chart. In separate voir dire testimony during trial, Walsh reported that McKillop had complied with all quality control procedures required by the national accrediting agency for the State laboratory.

Defense counsel did not identify any suspected flaws in the collection of the raw blood sample data about which counsel wished to cross-examine McKillop. Nor did defense counsel cross-examine Walsh about her tracking of the testing steps leading from the sample data to the finished chart. Counsel focused instead upon the general subject of audits of the State laboratory by Federal and private agencies in prior years. Although the defendant objected generally to Walsh's testimony, counsel did not identify any element of the DNA testing, analysis, or judgment, which Walsh had not independently reviewed and about which she could not undergo cross-examination. On those points, the substituted witness was not channeling forward the testimony of an absent witness, but presenting and answering for her own observations. Defense counsel had full opportunity to confront her upon the process of DNA identification.

In these circumstances the defendant has not suffered a harmful deprivation of his Sixth Amendment right of confrontation. Before the decision in *Crawford* v. *Washington, supra,* issued in 2004, Massachusetts evidentiary doctrine permitted an expert witness to offer an opinion based upon inadmissible hearsay information (i) so long as the information possessed customary reliability as a source for the opinion and would be admissible through an appropriate separate witness, and (ii) so long as the

testifying witness did not offer the details of the underlying hearsay on direct examination. The expert would be subject to cross-examination upon his opinion and, at opposing counsel's choice, upon the hearsay basis for it. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 527-532 (1986) (psychiatrist's opinion, resting partially upon reports not in evidence, admissible about mental state and dangerousness of detained juvenile); *Commonwealth* v. *Markvart*, 437 Mass. 331, 336-339 (2002) (in trial to determine sexually dangerous person status, qualified examiner may offer opinion based in part upon facts and data in police reports and witness statements from a nol prossed case). This standard accommodates the value of expert opinion to the fact finder and the impossibility of courtroom confrontation of the various sources of information contributing to the formation of that opinion. See *Commonwealth* v. *Avila*, 454 Mass. 744, 762 (2009), and cases cited.[14]

In Massachusetts and in multiple other jurisdictions,[15] this evidentiary principle has proceeded compatibly with the confrontation doctrine of the *Crawford* and *Melendez-Diaz* decisions. Thus far our cases have presented two recurrent situations: the opinion of a substitute medical examiner upon the cause or manner of death based upon the results of an autopsy performed by a different medical examiner[16]; and the opinion of

---

[14]The distinction between an opinion and its sources is genuine, but much easier *to* recite than *to* enforce at trial, as the Supreme Judicial Court has acknowledged. See *Commonwealth* v. *Durand*, 457 Mass. 574, 586 n.13 (2010), and cases cited.

[15]In *Commonwealth* v. *Barbosa*, 457 Mass. 773, 787 n.12 (2010), discussed *infra*, the court observed that, as of early September, 2010, or fourteen months after the release of *Melendez-Diaz*, numerous Federal and State appellate courts had concluded that the confrontation clause did not bar an expert from testifying to an opinion based on testimonial hearsay.

[16]See *Commonwealth* v. *Nardi*, 452 Mass. 379, 388-391 (2008) (post-*Crawford*, pre-*Melendez-Diaz*) (upholding admissibility of substitute medical examiner's opinion based in part upon unadmitted autopsy report); *Commonwealth* v. *Hensley*, 454 Mass. 721, 731-734 (2009) (substitute medical examiner's opinion upon cause of death was admissible; his additional references to autopsy information violated hearsay and confrontation standards but became harmless because the cause of death did not constitute a contested trial issue; error apparently preserved); *Commonwealth* v. *Avila*, *supra* at 760-763 (substitute medical examiner's presentation of factual information in autopsy report on direct examination violated hearsay and confrontation standards; error unpreserved; evidence merely cumulative; no substantial risk

a substitute DNA analyst based upon testing procedure and results performed by another analyst.[17]

The circumstances of *Commonwealth* v. *Barbosa*, 457 Mass. 773 (2010), resemble our own. The testifying analyst was a supervisor of the absent analyst. *Id.* at 782. Without objection, a table showing the results of the original analyst's testing came into evidence. *Id.* at 782-783. The information "was testimonial

of a miscarriage of justice); *Commonwealth* v. *Mercado*, 456 Mass. 198, 210-211 (2010) (medical examiner's opinion of cause of death based on report of autopsy by different examiner properly admitted; however direct examination references to specific findings in report violated right of confrontation; error unpreserved; no substantial risk of a miscarriage of justice because cause of death not a contested issue); *Commonwealth* v. *Durand*, *supra* at 581-588 (two substitute medical examiners' opinions of cause and manner of death, based on autopsy report prepared by nontestifying examiner, properly admissible, but testimony of graphic factual findings of autopsy violated hearsay and confrontation rights of defendant; error preserved and not harmless beyond a reasonable doubt); *Commonwealth* v. *McCowen*, 458 Mass. 461, 480-482 (2010) (substituted medical examiner presented observations, findings, and opinions in notes and reports of unavailable medical examiner who had performed autopsy; no objection; violations of hearsay and confrontation standards did not create a substantial likelihood of a miscarriage of justice because most of information cumulative of separate properly admitted evidence, and because absent examiner's noncumulative opinion assisted the defendant's exculpatory theory and closing argument); *Commonwealth* v. *Housen*, 458 Mass. 702, 710 (2011) (substitute medical examiner should not have been permitted to testify about factual findings of autopsy report on direct examination; no objection, and no substantial risk of a miscarriage of justice because facts to which he testified were undisputed).

[17]See *Commonwealth* v. *Banville*, 457 Mass. 530, 540-542 (2010) (substitute analyst offered opinions whether DNA on certain exhibits belonged to the defendant or victim upon basis of profiles developed by different, nontestifying chemist, but did not furnish specific information from work of the nontestifying analyst; any error resulting from language adopting conclusion of report and amounting to a confrontation violation did not create a substantial risk of a miscarriage of justice nor would it have violated more demanding harmless error standard); *Commonwealth* v. *Barbosa*, *supra* at 786-793 (senior DNA analyst offered inculpatory opinion effectively placing victim's blood upon the defendant's clothing, upon basis of test results produced by nontestifying analyst, but added testimony of opinion of absent analyst violating the defendant's confrontation right; error unpreserved; no substantial risk of a miscarriage of justice); *Commonwealth* v. *McCowen*, *supra* at 482-484 (successor DNA analyst's presentation of nontestifying predecessor's allele test results violated hearsay and confrontation standards; no objection; no substantial likelihood of miscarriage of justice because those numbers alone had insignificant probative value and acquired such value only from independent opinion of witness properly admitted and exposed to cross-examination).

hearsay admitted in violation of the confrontation clause." *Id.* at 783. Nonetheless the court found no substantial risk of a miscarriage of justice. It placed particular emphasis upon the objective reliability of DNA analysis:

> "We conclude that the balance here [between the probative value of the admissible opinion of the testifying expert and the prejudicial effect of the inadmissible results produced by the absent expert] weighs heavily in favor of the admission of the opinion, and that the objective nature of the science underlying DNA analysis strengthens the opinion's probative weight and diminishes the risk of unfair prejudice."

*Id.* at 789.

The risk of mishandling, mislabeling, or manipulation of raw material and data will not justify exclusion of the testifying expert's opinion because those possibilities inhere in the source material of typical forensic testimony and, as hypotheses, could always prevent the admission of reliable and informative expert assistance essential for education of the fact finder. *Id.* at 790. For "DNA analysis, the testing techniques are so reliable and the science so sound that fraud and errors in labeling or handling may be the *only* reasons why an opinion is flawed" (emphasis in original). *Ibid.* The reduction of room for interpretation and judgment by the precision of the science provides exceptional trustworthiness to the witness's opinion. In sum, the reliability of the opinion, the exposure of it to cross-examination, the speculative nature of any claims about alleged mishandling, mislabeling, and manipulation, and the supportive circumstantial evidence left no substantial likelihood of a miscarriage of justice from the improper admission of the absent analyst's test results and opinion. *Id.* at 793.

In our case, although defense counsel did not object to the admission of the results chart of the first analyst, she did object generally to the testimony of the substitute analyst upon confrontation grounds. Consequently we treat any error as one of a preserved constitutional character. The standard of review is whether the error was harmless beyond a reasonable doubt — whether the reviewing court is satisfied beyond a reasonable doubt that the

wrongly admitted evidence had little or no effect upon the verdict. *Chapman* v. *California*, 386 U.S. 18, 23 (1967). The Commonwealth must show that properly admitted evidence of guilt is "overwhelming, in the sense that it is so powerful as to nullify any effect that the improperly admitted evidence might have had on the fact finder or the findings." *Commonwealth* v. *Vasquez*, 456 Mass. 350, 362 (2010) (quotations and citations omitted).

The properly admitted evidence does leave us with that assurance. It consists of supervisor Walsh's expert opinion that the two DNA samples in question came from the same person (or from identical twins) and of the exceptional reliability of such an opinion; of the circumstance that during the relevant time period the defendant and Langlais were in close proximity and had ample opportunity to exchange identification bracelets for the purpose of an impersonation; that the defendant's thumbprint accompanied both the blood samples in question; and that a subsequent DNA sample from Langlais differed from the first two. Defense counsel had ample opportunity to cross-examine Walsh. Counsel launched no specific challenge to her opinion. Amid the total evidence, then, the effect of the erroneous admission of the chart of test results from the original analyst was marginal, cumulative, and harmless beyond a reasonable doubt.[18]

2. *Sufficiency of evidence for the indictment.* The defendant contends that the grand jury did not receive sufficient evidence to support the indictment for conspiracy to tamper with a DNA record and that the judge wrongly denied his motion to dismiss the charges against him. We disagree.

A "grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him."

---

[18]In addition to the *Vasquez* formulation, *supra*, the language in some of the Federal decisions brings us to the same conclusion. See *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 40 (1992), quoting from *Delaware* v. *Van Arsdall*, 475 U.S. 673, 682 (1986):

> "To determine whether the improper admission of uncross-examined testimony was harmless beyond a reasonable doubt, the Supreme Court listed factors to be considered. 'These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' "

*Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). The standard of probable cause is "considerably less exacting than a requirement of sufficient evidence to warrant a guilty finding." *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984). Although G. L. c. 274, § 7, does not define conspiracy, our common law identifies it as a "combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose." *Commonwealth* v. *Lonardo*, 74 Mass. App. Ct. 566, 568-569 (2009).

The grand jury heard sufficient evidence for a finding of probable cause. While no direct evidence existed of a conspiracy between the defendant and Langlais, circumstantial evidence powerfully supported the reasonable inference of a conspiracy. See *Commonwealth* v. *Pratt*, 407 Mass. 647, 653 (1990) ("[a] conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had"). The defendant and Langlais lived in the same cellblock at the time of the April 12 collection. They had the ability to remove, and thus exchange, their identification bracelets. The blood and thumbprint on the April 12 sample matched those of the February 25 sample provided by the defendant. The identical DNA profiles from the blood samples could have resulted only from identical twins or a single individual. Compelling evidence pointed to a single individual as the source of both samples.

This evidence amply permitted the grand jury to find probable cause that the defendant had conspired with Langlais to provide a sample for him on April 12. The judge properly denied the defendant's motion to dismiss.

3. *Sufficiency of evidence for the conviction.* We review the denial of a defendant's motion for a required finding of not guilty to determine whether, when viewed in the light most favorable to the Commonwealth, the evidence would satisfy a rational trier of fact of each element beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). Our inquiry centers upon "whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Brown*, 401 Mass. 745, 747 (1988).

In the light most favorable to the Commonwealth, the evidence

supported the inference that the defendant and Langlais agreed that the defendant would impersonate Langlais and provide a blood sample for him on April 12. See *Commonwealth* v. *D'Amour*, 428 Mass. 725, 748 (1999), quoting from *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 493-494 (1921) ("The heart of conspiracy is the formulation of the unlawful agreement or combination"). The Commonwealth replicated the evidence submitted to the grand jury.[19] Both classification manager Michael Perkins and CODIS staff member Kelly King testified to their reliance upon the identification information presented to them by inmates — oral representations of their identities and information taken from their identification bracelets.

This body of circumstantial evidence supported the inference, beyond a reasonable doubt, that the defendant and Langlais had agreed to carry out the impersonation and DNA tamper. The judge correctly denied the defendant's motion for a required finding of not guilty.

4. *The accident instruction.* Finally, the judge correctly denied the defendant's request for a jury instruction upon the defense of accident. That defense requires evidence of accidental conduct or mistaken intent by the *defendant.* No such evidence developed here. Rather the defendant has mistakenly contended that evidence of prior errors by CODIS or corrections staff in the process of DNA collection entitles him to the instruction. See *Commonwealth* v. *Hutchinson*, 395 Mass. 568, 578-579 (1985) (evidence fails to warrant the accident instruction).

*Conclusion.* We affirm the defendant's conviction. Testimony by the DNA analyst did not offend his right of confrontation. The erroneous admission of the chart of test results from the original analyst was harmless beyond a reasonable doubt. Sufficient evidence supported the indictment and his conviction. The judge did not erroneously refuse to give accident instruction.

*Judgment affirmed.*

---

[19]In addition to Walsh, a State police crime scene analyst testified. He stated that the defendant's thumbprint matched the exemplar thumbprint on the April 12 collection sample. He explained that he had individualized the defendant's thumbprint, i.e., that he identified it as belonging to the defendant to the exclusion of other individuals.