## Commonwealth *vs.* German Munoz.

Berkshire. October 4, 2011. - December 15, 2011.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Controlled Substances. Evidence,* Expert opinion, Hearsay, Past recollection recorded. *Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Practice, Criminal,* Confrontation of witnesses, Hearsay, Assistance of counsel. *Witness,* Expert.

Discussion of the standard of review applicable to constitutional and evidentiary claims that were not preserved. [129-130]

At the trial of an indictment charging the defendant with trafficking in over fourteen grams of cocaine, no substantial risk of a miscarriage of justice arose from testimony regarding the composition of a substance that police seized from the vehicle that the defendant was driving, offered by a State drug laboratory chemist who was not the chemist who tested the seized substance, where the testifying chemist could give his independent, expert opinion as to the composition of the substance [130-137]; however, the judge erred in permitting the substitute chemist to testify to the weight of the substance, where the witness did not augment otherwise inadmissible data by expertise [137-138].

At a criminal trial, the judge erred in admitting in evidence as recorded recollection two police reports, where the testifying police officer did not assert a revivable recollection of certain aspects of the case discussed in the reports. [138]

At a criminal trial, no substantial risk of a miscarriage of justice arose from the admission in evidence of improper opinion evidence and certain hearsay statements, where the properly admitted evidence of guilt was overwhelming, and where the improperly admitted testimony not only was cumulative but also assisted the defendant in challenging aspects of the Commonwealth's case [138-140]; further, the trial record did not indisputably show that trial counsel's strategic choice with regard to an expert witness was manifestly unreasonable when made [140-142].

Indictment found and returned in the Superior Court Department on March 24, 1994.

The case was tried before *John A. Agostini*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Cynthia Vincent Thomas* for the defendant.

*Karen L. Carlo*, Assistant District Attorney, for the Commonwealth.

LENK, J. The defendant appeals from his conviction of trafficking in over fourteen grams of cocaine, G. L. c. 94C, § 32E.[1] He contends that the Commonwealth violated his right to confront the witnesses against him when it introduced evidence from laboratory drug tests through the testimony of a substitute analyst rather than through the analyst who performed the tests. He contends further that the trial judge erred in admitting certain hearsay statements. Finally, he argues that his trial counsel was constitutionally ineffective. Although much of the challenged testimony was erroneously admitted, this testimony did not create a substantial risk of a miscarriage of justice; nor was the defendant denied the effective assistance of counsel. We therefore affirm the conviction.

1. *Facts*. The following are the facts the jury could have found; we reserve certain details for later discussion. On March 2, 1994, Pittsfield police officers stopped a car driven by the defendant. The car was leased in the names of two other men, one of whom, the front seat passenger, was sixteen years old. Officers searched the vehicle and found three large plastic bags that contained a substance resembling "crack" cocaine. The police also seized a pager and two "walkie-talkies" from the vehicle.

The defendant and his passenger were then arrested and given Miranda warnings.[2] In the presence of another Pittsfield police officer, Detective Terrence Donnelly asked the defendant whether the police had found all the cocaine in the vehicle. The defendant told Donnelly, "I think that there [were] only the three bags." Donnelly recorded this statement in a near contemporaneous report, which was reviewed by the other officer, Sergeant Glen Decker.

The same evening, Donnelly "field tested" the substance in the seized bags and weighed the substance and bags on a scale,

---

[1]An indictment charging a violation of the controlled substances laws within a school zone was nol prossed.

[2]*Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966), requires that a suspect "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," prior to custodial interrogation.

apparently in Decker's presence.[3] The test indicated that the substance was cocaine.[4]

The seized bags were sent to the Department of Public Health drug laboratory (laboratory), where samples of their contents were weighed and tested by Paul Jaszek, who was then a senior chemist, or supervisor, at the laboratory. Jaszek's analysis proceeded in two parts. First, Jaszek verified the net weight of the substance by subtracting the estimated weight of the plastic bags, based on a sample of them, from the gross weight of the bags and the substance combined. He recorded this net weight as 19.90 grams. Next, Jaszek confirmed that the seized substance was in fact cocaine. He did this by running samples of the substance through a gas chromatograph and a mass spectrometer. The chromatograph generated a printout of the "retention times" of each compound in the sample. The mass spectrometer generated a printout of the "fragmentation pattern" of the sample. Both sets of results were consistent with the expected results for cocaine.

Trial was scheduled for July 7, 1994. However, the defendant defaulted, remaining a fugitive until February, 2010. In the interim, Jaszek retired and Donnelly passed away. Donnelly's reports, Jaszek's notes and test results, and the machine data generated by Jaszek's tests were preserved.

At the May, 2010, trial, the laboratory's then senior chemist, James Hanchett, testified in the retired Jaszek's place. Hanchett had been a drug analyst for over thirty years, the majority of those as Jaszek's colleague. Jaszek had trained Hanchett and for some period of time had been Hanchett's supervisor.

Hanchett's testimony covered (1) the procedure Jaszek followed in weighing and analyzing the contents of the bags; (2) the conclusions that Jaszek drew from this analysis; and (3) the conclusions that Hanchett "would have made" in Jaszek's position. Because Hanchett did not retest or reweigh the seized substance

---

[3]Although Detective Terrence Donnelly performed the field test, the Commonwealth stated at trial that Sergeant Glen Decker had a personal recollection of the test; the defendant does not contest this assertion.

[4]The test involved breaking an ampule of chemicals that react in the presence of cocaine into a test tube containing a sample of the seized substance. The officers observed a positive reaction between the chemicals and the seized substance.

himself, his testimony was based on information contained in Jaszek's notes and reports as well as the machine printouts generated by Jaszek's analysis.[5] After Hanchett testified that he had reviewed each of these documents, the prosecutor asked him:

> Q.: "Again, in reviewing that data, can you form an independent opinion that the substance[] that went through the machine after reviewing the data was Class B, cocaine?"

> A.: "Yes, I would have made the same decision as [Jaszek] made calling it cocaine . . . ."

Hanchett stated also that he agreed with Jaszek's method of weighing the seized substance, and that he too would have concluded the substance weighed 19.90 grams.

The Commonwealth's other main witness was Decker, who testified to the events of the night of the defendant's arrest, sixteen years prior to trial. Decker stated that he could not recall the details of the conversation he witnessed between Donnelly and the defendant. He was then allowed to read a redacted version of Donnelly's report to the jury. The report, however, did more than summarize the conversation Decker had forgotten. It recited the full details of the stop, search, booking, and arrest, details that Decker was able to testify to without assistance from Donnelly's report. Subsequently, the defendant entered a redacted copy of Donnelly's report into evidence. Defense counsel believed that the report tended to show that the defendant's passenger was the true owner of the drugs, consistent with the defendant's theory at trial.

2. *Discussion.* a. *Standard of review.* We consider first the standard of review applicable to the defendant's two claims of error: violation of his confrontation clause rights through Hanchett's testimony and improper admission of hearsay testimony through Decker's use of recorded recollection.

While trial counsel objected to Hanchett's testimony, it was on the basis of lack of foundation and was not targeted at the

---

[5]The documentary materials relating to Jaszek's testing, however, were not admitted in evidence.

propriety of such testimony under the confrontation clause.[6] Accordingly, the claim was not preserved. As to the hearsay claim, with one exception, see note 16, *infra*, the defendant did not object to the admission of the statements in police reports that he now contends are hearsay. Thus, this claim also was not preserved.

Accordingly, we review only for a substantial risk of a miscarriage of justice, that is, to determine "if the evidence and the case as a whole . . . [leave] us with a serious doubt that the defendant['s] guilt [has] been fairly adjudicated." *Commonwealth v. Vasquez*, 456 Mass. 350, 356 (2010), quoting *Commonwealth v. Amirault*, 424 Mass. 618, 646-647 (1997).

b. *Substitute analyst's testimony on the identity of the cocaine.* The defendant's primary argument on appeal is that Hanchett's testimony as to the weight and composition of the cocaine seized from the vehicle violated the defendant's right to confront the witnesses against him, as guaranteed by the Sixth Amendment to the United States Constitution. See *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2713 (2011) (*Bullcoming*). The Commonwealth does not dispute that Hanchett's testimony on direct examination as to Jaszek's conclusions and the raw data generated by Jaszek violated the defendant's right of confrontation. See *Commonwealth v. Barbosa*, 457 Mass. 773, 786 (2010) (*Barbosa*).

---

[6]When asked by the judge for a basis for his objection, counsel responded, "[F]oundation of knowledge." He went on to say, at sidebar, that Hanchett was

> "basically testifying as to what a guy named Paul did. But there is no foundation to bridge that. How is it that if someone else did the testing, how is it that he now has the information? He's testifying to that without foundation."

The defendant's objection was not adequate "in the context of the trial as a whole." *Commonwealth v. Koney*, 421 Mass. 295, 299 (1995). Although counsel made reference to some of the concerns underlying the United States Supreme Court's recent confrontation clause jurisprudence, he made no explicit reference to the confrontation clause, or the Sixth Amendment to the United States Constitution, either in making his objection or at any other point during trial. Compare *Commonwealth v. Tanner*, 66 Mass. App. Ct. 432, 440 n.5 (2006) (general objection "sufficient to alert" judge and opponent given "previous discussions between the judge and counsel on this precise issue"). Further, counsel did not renew his objection after the prosecutor had asked Hanchett standard foundation questions. Thus, the judge and the Commonwealth would reasonably have inferred that the defendant's objection was what it purported to be: an objection to foundation alone.

However, the Commonwealth maintains that, consistent with *Barbosa*, the confrontation clause did not prevent Hanchett from testifying as to his independent opinion on the weight and composition of the cocaine. By contrast, the defendant maintains that the United States Supreme Court's recent decision in *Bullcoming* precludes such testimony.

i. *Validity of* Barbosa *in light of* Bullcoming. The Sixth Amendment, applicable to the States through the Fourteenth Amendment to the United States Constitution, requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[7] The confrontation clause "applies to 'witnesses' against the accused — in other words, those who 'bear testimony.' . . . 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " See *Crawford* v. *Washington*, 541 U.S. 36, 51 (2004), quoting 2 N. Webster, An American Dictionary of the English Language (1828).

In *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009) (*Melendez-Diaz*), the United States Supreme Court addressed whether the conclusions of forensic scientists constitute testimonial statements. The Court determined that certificates verifying the conclusions of such tests "are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* at 2532, quoting *Crawford* v. *Washington*, *supra*. Thus, the Court held, such certificates cannot be admitted in evidence without providing defendants with an opportunity to confront the forensic scientists who author them.

Nevertheless, it was "not plain . . . whether *Melendez-Diaz*, which involved the admission into evidence of affidavits containing testimonial hearsay, would necessarily require the government to call [an analyst] to testify [where] her report [is] not admitted into evidence," but is instead relied on as the basis for the independent opinion of a second analyst. *United States* v. *Pablo*, 625 F.3d 1285, 1295 (10th Cir. 2010).

---

[7]Analogously, art. 12 of the Massachusetts Declaration of Rights provides that a criminal defendant "shall have a right to . . . meet the witnesses against him face to face." In this respect, "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment." *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006).

In light of this uncertainty, our cases since *Melendez-Diaz* have distinguished between a substitute analyst's testimony as to independent opinions based on data generated by a nontestifying analyst, and a substitute analyst's testimony as to the testing analyst's reports and conclusions.[8] For example, in *Barbosa, supra*, we concluded that a substitute deoxyribonucleic acid (DNA) analyst should not have been allowed to read into evidence the results of DNA testing where the relevant tests were performed by an absent colleague. We concluded also that it was error to allow the analyst to testify as to the conclusions her absent colleague drew from that data. *Id.* However, we held that the substitute analyst could testify as to her own conclusions derived from the data generated by the original analyst's tests. *Id.* See *Commonwealth* v. *Nardi*, 452 Mass. 379, 390-391 (2008) (independent opinion of substitute medical examiner).

The defendant suggests that *Barbosa* is called into question by *Bullcoming, supra*, the most recent decision of the United States Supreme Court to address the admissibility of forensic evidence under the confrontation clause. Yet, unlike *Barbosa* and unlike the instant case, *Bullcoming* is not a case "in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence."[9] See *Bullcoming, supra* at 2722 (Sotomayor, J., concurring in part). In *Bullcoming*, the analyst who had performed a blood alcohol test on the defendant's blood sample was placed on unpaid leave shortly before trial.[10] Over objection, the State admitted the testing analyst's report as a business

---

[8]Several other State and Federal appellate courts have drawn an analogous distinction. See, e.g., *United States* v. *Pablo*, 625 F.3d 1285, 1292-1295 (10th Cir. 2010); *United States* v. *Turner*, 591 F.3d 928, 932-933 (7th Cir. 2010); *People* v. *Williams*, 238 Ill. 2d 125, 149-150 (2010), cert. granted, 131 S. Ct. 3090 (2011); *People* v. *Lewis*, 287 Mich. App. 356, 363 (2010) (additionally concluding reports nontestimonial); *Jenkins* v. *State*, 2010-KA-00203-COA, par. 27-par. 30 (Miss. Ct. App. 2011); *Vega* v. *State*, 236 P.3d 632, 638 (Nev. 2010). See also *People* v. *Sisneros*, 174 Cal. App. 4th 142, 154 (2009) ("admission of expert testimony based on hearsay will typically not offend Confrontation Clause protections"); *Pendergrass* v. *State*, 913 N.E.2d 703, 708 (Ind. 2009) (both substitute analyst and supervisor of original analyst were available at trial).

[9]We note that *People* v. *Williams, supra*, is such a case.

[10]The Court expressed particular concern that the substitute analyst "had no knowledge of the reason why [the testing analyst] had been placed on unpaid

record through a testifying analyst. *Id.* at 2712. The Court observed that the substitute analyst did not purport to offer any " 'independent opinion' concerning Bullcoming's [blood alcohol concentration]" on which the substitute could be cross-examined. *Id.* at 2716. Rather, the evidence against the accused was limited to the testing analyst's "certification," which was directly introduced in evidence. *Id.* The Court remanded the case for a determination whether the admission of the report was harmless error. *Id.* at 2719 & n.11.

The testimony offered by the prosecutor in *Bullcoming* would have been equally improper under long-standing Massachusetts law. See *Commonwealth* v. *Nardi, supra* at 392-393, quoting *Commonwealth* v. *McNickles*, 434 Mass. 839, 857 (2001) ("We adhere to our position that an expert witness may not, on direct examination, present the specifics of hearsay information on which she has relied in reaching her opinion"). Thus, in *Barbosa, supra* at 786, while we permitted the substitute analyst's independent opinion testimony, we specified that "[t]he defendant's right of confrontation was . . . violated by [substitute] testimony . . . which informed the jury that [the testing analyst] also shared [the substitute's] opinion." This, essentially, was a different way of stating the central holding of *Bullcoming*: that a substitute analyst cannot testify to, or otherwise introduce, the original analyst's reports and conclusions on direct examination. Because *Barbosa* is in accord with this holding, the defendant errs in maintaining that *Bullcoming* prevents its continued application.

The defendant argues that the opinion testimony of a substitute analyst cannot fairly be characterized as "independent," because the accuracy of any such opinion depends entirely on the accuracy of the testing analyst's procedure. See *Derr* v. *State*, 422 Md. 211 (2011). He contends that this dependence prevents meaningful cross-examination of the substitute analyst, who cannot speak to the accuracy of the testing process and procedures actually employed.

A substitute analyst who offers an independent opinion can, however, be cross-examined meaningfully in at least two ways.

leave" and, specifically, "whether incompetence, evasiveness, or dishonesty accounted for [his] removal from his work station." *Bullcoming* v. *New Mexico*, 131 S. Ct. 2705, 2715 (2011) (*Bullcoming*).

First, such an analyst is subject to cross-examination on the general risk of error in forensic testing, whether introduced through carelessness, incompetence, or fraud. See *Melendez-Diaz, supra* at 2536-2537 (discussing such risks); National Research Council, Strengthening Forensic Science in the United States: A Path Forward 37 (2009) (noting risk that "scientific evidence [could] carr[y] a false sense of significance"). Here, for example, among other possible sources of error, the defendant questioned Hanchett on the risk that the testing analyst might have tested the wrong vial, the general level of training of analysts at the laboratory, and the quality of the equipment used.

Second, a substitute analyst, basing an independent opinion on data generated by a prior analyst, can be cross-examined on many of the specific risks that could lead to an erroneous conclusion concerning the identity and weight of a substance at issue in a particular case.[11] Contrast *Bullcoming, supra* at 2715 (noting testifying analyst who did not offer independent opinion could not be cross-examined as to "the particular test and testing process . . . employed," with which he had no familiarity). An expert witness offering an independent opinion, however, can permissibly rely on data only to the extent that this data is "reasonably relied upon by experts in the particular field in forming opinions." *Department of Youth Servs. v. A Juvenile*, 398 Mass. 516, 527-528 (1986), quoting Proposed Mass. R. Evid. 703. Reasonable reliance, in turn, implies that the expert will have ascertained that the data on which he or she relies are adequate and appropriate to the task and were prepared in conformity with accepted professional — here scientific — practices and procedures. See *Barbosa, supra* at 791 ("a conclusory opinion alone may not be a permissible basis on which an expert may rest an opinion"). See also *Palandjian v. Foster*, 446 Mass. 100, 107-108 (2006) ("even if the methodology employed by an expert is generally reliable, . . . the trial judge, acting as gatekeeper, [must] determine whether the conclusions . . . have a reliable factual basis"); *Wing v. Commonwealth*,

---

[11]A substitute analyst who has not independently reviewed the data underlying a particular scientific conclusion would not be able to respond meaningfully if asked whether the data permit the inference that one or more of the risks inherent in a particular course of testing were in fact realized, or whether the data otherwise suggest that the result obtained was flawed or anomalous.

359 Mass. 286, 290 (1971) (testimony based on hearsay study admissible where expert had "verified" study and was thus not offering opinion "of another").

A substitute analyst may accordingly be cross-examined on the data on which that analyst purports to have relied reasonably, the basis on which he or she concluded that such data were adequate and appropriate to the task, and the basis for concluding that the data had been prepared in conformity with relevant accepted professional standards, inquiries that implicate the manner in which the testing analyst performed his or her work.[12] See generally *In re A.B.*, 999 A.2d 36, 43 (D.C. 2010).

Indeed, cases since *Barbosa* illustrate meaningful use of cross-examination of a substitute expert analyst offering independent opinion testimony not just on the general risks of error inherent in forensic testing, but also on the strength of the particular evidence against a defendant. See, e.g., *Commonwealth* v. *Greineder*, 458 Mass. 207, 239 (2010) ("Defense counsel made extensive use of the data prepared by [original DNA analyst]" to buttress "theory that a third party committed the murder"); *Commonwealth* v. *McGrail*, 80 Mass. App. Ct. 339, 343 (2011) ("defense counsel engaged in a detailed cross-examination of [substitute analyst], eventually placing significant weight on [that analyst's] testimony in his closing argument").

Cross-examination of a substitute analyst with an independent opinion will not, of course, address every risk of bias or error in the forensic testing forming the basis of that opinion. Cf. *Melendez-Diaz, supra* at 2537 (cross-examination may cause "the analyst who provides false results . . . , under oath in open court, [to] reconsider his false testimony"). However, the Constitution has not yet been construed to require the testimony of every person who might conceivably have compromised the reliability of the evidence introduced against a defendant. See *id.* at 2532 n.1 ("not . . . everyone who laid hands on the evidence must be called").

---

[12]In this case, for example, Hanchett was asked on direct examination whether the testing procedures described in Jaszek's notes and reports, which were not in evidence, comported with accepted laboratory practice. While this inquiry was improper under *Commonwealth* v. *Barbosa*, 457 Mass. 773, 789 (2010) (*Barbosa*), nothing would prevent a defendant from asking the converse question during cross-examination in a case where the testing analyst's notes and reports revealed cause for concern.

Of necessity, the adequacy of a defendant's opportunity for meaningful cross-examination of a particular expert witness can be ascertained only on a case-specific basis. As a general proposition, however, and consistent with *Barbosa*, we discern no reason to conclude either that cross-examination of a substitute analyst offering an independent opinion cannot be meaningful or that the opinion offered cannot fairly be characterized as independent.

ii. *Applicability of* Barbosa. The defendant argues that *Barbosa* should not be extended from DNA testing to the drug composition testing performed by Jaszek. He argues that forensic drug test results are so straightforward that the substitute analyst conducts no "meaningful analysis" but instead serves as a mere conduit for conclusions compelled by raw data generated by the first analyst.

The defendant provides no support for his assertion that the results of drug composition tests require less independent interpretation than the results of DNA tests.[13] There is nothing in the appellate record as to the content of the notes, test results, machine generated data, or reports reviewed by Hanchett, and the defendant makes no argument concerning how these might differ from the counterpart material reviewed by a DNA analyst.[14] Accordingly, the defendant has not shown any reason that *Barbosa* should be distinguished in this case.

We note also that Hanchett had a "personal, albeit limited, connection to the scientific test at issue." *Bullcoming, supra* at 2722 (Sotomayor, J., concurring in part). As a senior chemist

---

[13]While the defendant here portrays deoxyribonucleic acid (DNA) analysis as more subjective than drug composition analysis, the defendant in the *Barbosa* case argued also that "there is no meaningful distinction between the opinion and the underlying fact finding." *Barbosa, supra* at 789. There, we questioned the premise that "where a forensic science has developed to the point that the analysis of data yields an objective opinion . . . rather than a subjective opinion that depends on the experience and judgment of the examiner, the distinction between the opinion and the underlying fact finding evaporates." *Id.* at 788. We observed that this argument would carry "the perverse implication . . . that, the better the science, the less admissible the opinion." *Id.* at 789.

[14]In particular, the defendant offers no comparison between the data produced by the gas chromatograph mass spectrometer test conducted here and the data produced by the gas chromatograph machine used in *Bullcoming*. The United States Supreme Court described the interpretation of the latter results as "not so simple or certain." *Bullcoming, supra* at 2711 n.1.

with over thirty years' experience at the laboratory, Hanchett was intimately familiar with its policies and procedures. Further, while Hanchett was not Jaszek's supervisor or otherwise responsible for reviewing Jaszek's work, compare *Pendergrass* v. *State*, 913 N.E.2d 703, 708 (Ind. 2009), Hanchett had a long working relationship with Jaszek, which terminated only at Jaszek's retirement. Accordingly, Hanchett was likely familiar with Jaszek's reputation for veracity and diligence. Compare *Bullcoming*, *supra* at 2715 (noting substitute analyst "had no knowledge . . . whether incompetence, evasiveness, or dishonesty accounted for [testing analyst's] removal from his work station"). Compare also *Commonwealth* v. *Walker*, 442 Mass. 185, 198 (2004) (discussing scope of permissible reputation evidence).

Hanchett's testimony reflects that he was not merely describing Jaszek's tests and results to the jury but also stating his independent view on the import of those results. Certainly, many of the questions that the prosecutor posed to Hanchett were improper, even though they did not elicit objection at trial. The prosecutor inquired extensively as to the testing procedures that Jaszek used or likely would have employed and failed to target with sufficient precision Hanchett's independent opinion on the identity of the sample. Instead, Hanchett was allowed broad leeway to opine on what "Paul [Jaszek] tested" and the "decision[s] . . . Paul made."

Nevertheless, the prosecutor did repeatedly ask Hanchett whether he "work[ed] through the numbers" himself, whether he "form[ed] an independent opinion" as to the composition of the tested sample, and whether, "based on [his] observations and reading, . . . each of those six individual pieces that were sampled were all positive for . . . cocaine." These questions required Hanchett to do more than merely reiterate Jaszek's conclusions. Thus, on more than one occasion, the substitute analyst was asked for, and provided, his independent, expert opinion. There was no confrontation clause error in the admission of this portion of Hanchett's testimony. See *Barbosa, supra.*

c. *Substitute analyst testimony on the weight of the cocaine.* While Hanchett could testify permissibly to his independent opinion on the identity of the seized substance as cocaine, his opinion on the weight of the substance was admitted in error.

Where the conclusion to be drawn from given data is obvious to a layperson, expert testimony does not assist the trier of fact, and opinion evidence is therefore improper. See *Commonwealth* v. *Little*, 453 Mass. 766, 768 (2009). As discussed, *supra*, Jaszek's recorded observations of weight were inadmissible through Hanchett on direct examination. See *Barbosa*, *supra* at 786. Hanchett's testimony did not augment these otherwise inadmissible data by expertise. Rather, he performed simple arithmetic well within the jury's grasp. See *Bullcoming*, *supra* at 2714. Accordingly, it was error to allow Hanchett to testify to the weight of the drugs and to opine that this weight was almost six grams over the statutory limit.[15]

d. *Recorded recollection.* The Commonwealth concedes that large portions of the two police reports read into evidence by Decker were admitted improperly as Decker's recorded recollection. Admission of evidence under the past recollection recorded exception to the hearsay rule "is only proper 'if . . . the witness has no revivable recollection of the subject.' " *Commonwealth* v. *Morgan*, 449 Mass. 343, 366 (2007), quoting *Commonwealth* v. *Nolan*, 427 Mass. 541, 543 (1998). Yet, Decker testified only that he had forgotten details of the defendant's conversations with Donnelly; he did not assert that he lacked a revivable recollection of other aspects of the case also discussed in the reports. Accordingly, the reports' descriptions of the circumstances of the defendant's arrest, the search of the vehicle the defendant was driving, the fruits of that search, the booking process, and the false name provided by the defendant at booking each constituted inadmissible hearsay.

e. *Substantial risk of miscarriage of justice.* As previously noted, all but one of the defendant's errors were raised for the first time on appeal.[16] Thus, the defendant is entitled to relief only "if we have a serious doubt whether the result of the trial

---

[15]The situation would be otherwise had Hanchett himself weighed the substance, which was available at trial as an exhibit.

[16]The preserved claim of error is that a sentence in Donnelly's report constituted improper opinion testimony. That line read, "Twenty grams is a large amount of crack cocaine." This statement was cumulative of evidence to which no objection was made, and the jury were aware that any amount of cocaine over fourteen grams was sufficient for a trafficking conviction. Accordingly, it is unlikely that this statement had anything more than a "very

might have been different had the error[s] not been made." *Commonwealth* v. *Russell*, 439 Mass. 340, 345 (2003), quoting *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999). "Errors of this magnitude are extraordinary events and relief is seldom granted." *Commonwealth* v. *Randolph*, 438 Mass. 290, 297 (2002).

This was not a case where the evidence was "limited to the word of the police," *Commonwealth* v. *Martin*, 57 Mass. App. Ct. 272, 276 (2003), but one in which the properly admitted evidence of guilt was overwhelming. See *Commonwealth* v. *Tyree*, 455 Mass. 676, 704 n.44 (2010). As to the identity of the seized substance as cocaine, the jury were aware of Hanchett's properly admitted independent opinion on the identity of the seized substance, as well as Decker's unchallenged testimony as to the police field testing. Contrast *Commonwealth* v. *Vasquez*, 456 Mass. 350, 364 (2010) (admission of certificate of drug analysis was prejudicial error where no field testing was conducted and Commonwealth's witnesses explicitly relied on accuracy of certificate). As to the weight of the cocaine, Decker testified from his personal knowledge that the police officers themselves weighed the cocaine, estimating its weight at twenty grams.[17] As to the defendant's constructive possession of the cocaine, the properly admitted portions of the Donnelly report contained statements by the defendant suggesting that he was aware of the presence of cocaine in the vehicle. These statements were "further support[ed]" by evidence of the defendant's consciousness of guilt: the defendant's prior default and his use of at least two aliases in interactions with the police. See *Commonwealth* v. *Pimentel*, 73 Mass. App. Ct. 777, 783 (2009).

Further, "[t]he admission of cumulative evidence does not commonly" call a guilty verdict into question. *Commonwealth* v. *Bart B.*, 424 Mass. 911, 915 (1997), and cases cited. The reports relied on by Decker as recorded recollections were

---

slight effect" on the jury. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). Therefore, we conclude that the statement was not prejudicial. See *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

[17]The defendant did not challenge the accuracy or sensitivity of the scale, and Decker was competent to give this testimony. Cf. *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 133 (1875) (lay witness may "express an opinion on . . . weight of objects").

cumulative of Decker's testimony from his direct recollection. Similarly, Hanchett's testimony as to the weight of the sample was cumulative of Decker's testimony on weight.

Finally, as we have observed in other contexts, any prejudice resulting from the erroneous admission of evidence can be "limited by defense counsel's . . . use" of that evidence. *Commonwealth* v. *Medeiros*, 456 Mass. 52, 62 (2010). Here, the defendant was able to use Jaszek's absence at trial to cast doubt on the results of the laboratory testing.[18] Similarly, the defendant relied on the more detailed of the two reports to argue that the police had no evidence suggesting that the drugs were owned by the defendant rather than his passenger.[19] Thus, the improperly admitted testimony assisted the defendant in challenging aspects of the Commonwealth's case.

We therefore conclude that those portions of testimony by Hanchett and Decker that were admitted in error did not give rise to a substantial risk of a miscarriage of justice.

f. *Ineffective assistance of counsel.* "[T]he preferred method for raising a claim of ineffective assistance of counsel is through a motion for a new trial." *Commonwealth* v. *Zinser*, 446 Mass. 807, 810 (2006), quoting *Commonwealth* v. *Alamides*, 37 Mass. App. Ct. 339, 344 (1994). "[A]n ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions." *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002). For such a claim to be successful, counsel's inadequate performance must "appear[] indisputably on the trial record." *Commonwealth* v. *Zinser*, *supra* at 811.

As noted, the defendant's theory at trial was not that the

---

[18]Counsel emphasized on cross-examination that Hanchett had never seen the tested drug samples prior to trial, and reiterated at closing that notwithstanding Hanchett's confident demeanor on the stand, "[h]e didn't personally test these drugs, he could have . . . [h]e didn't watch [Jaszek] do the test."

[19]Indeed, the defendant's trial counsel moved to admit a copy of the report, which also contained a statement representing that the passenger in the vehicle had been arrested previously for a drug offense. He then referred repeatedly to the report in closing, urging the jury to "read it." Counsel had previously noted his specific concern that the jury would disbelieve his representations about the absence of evidence in the report tying the defendant to the drugs if they were presented with a heavily redacted version of the report, such as one redacted to remove hearsay.

substance seized by the police was something other than cocaine, but that the seized drugs belonged to the passenger of the vehicle the defendant was driving. Because of this strategy, trial counsel did not seriously contest the weight and identity of the drugs. Instead, counsel directed the jury's attention to evidence supporting the Commonwealth's position that cocaine was found in a car the defendant was driving, to argue that nothing in that evidence conclusively demonstrated that the drugs belonged to the defendant rather than his passenger. On appeal, the defendant contends that this strategy was manifestly unreasonable.[20]

"A defendant is not deprived of the effective assistance of counsel simply because defense counsel's reasonable strategic choices fail to produce a verdict of not guilty." *Commonwealth* v. *Lykus*, 406 Mass. 135, 139 (1989). However, counsel's strategic judgment cannot have been "manifestly unreasonable when made." *Commonwealth* v. *LaCava*, 438 Mass. 708, 713 (2003), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). A strategic judgment is likely unreasonable if trial counsel's strategy deprived the defendant of "an otherwise available, substantial ground of defence." *Commonwealth* v. *Hill*, 432 Mass. 704, 719 (2000), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). But "[n]either ineffectiveness nor a likelihood of a miscarriage of justice arise from counsel making the best he can out of the circumstances of the crime." *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 471 (1998).

Albeit before the United States Supreme Court decided *Bullcoming*, it was clear at the time of trial that Hanchett's testimony as to Jaszek's reports and conclusions was inadmissible under Massachusetts law. See *Barbosa*, *supra* at 786. Nevertheless, even if the defendant had objected to this testimony, the Commonwealth would have been permitted to present Hanchett's independent opinion testimony, corroborated by the

---

[20]The defendant questions also trial counsel's failure to object to the hearsay testimony discussed in parts 2.b and 2.c, *supra*. "[W]hen the claim of ineffectiveness is predicated . . . on counsel's failure to object to something that occurred at trial, the standard for evaluating the ineffectiveness claim is not significantly different from the substantial risk standard that is applicable to our review of the underlying, unpreserved error." *Commonwealth* v. *Azar*, 435 Mass. 675, 686 (2002). Accordingly, these claims are governed by the analysis in part 2.e, *supra*.

results of the field testing conducted by Decker and his partners. See *id.* In light of this admissible evidence, it was not unreasonable for counsel to conclude that a jury would have been more likely to believe that the drugs did not belong to the defendant than that the substance was not in fact cocaine. In sum, the trial record does not indisputably show that trial counsel's strategic choice was manifestly unreasonable when made.

*Judgment affirmed.*